RECORD NO. 14-2160

## IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

LAVERNE JONES; STACEY JONES, f/k/a Stacey Ness;
Individually and on behalf of the Certified Class,

*Plaintiffs-Appellants,*

v.

BERNALDO DANCEL; AMERIX CORPORATION;
3C INCORPORATED; CAREONE SERVICES, INCORPORATED;
ASCEND ONE CORPORATION,

*Defendants-Appellees.*

CIVIL JUSTICE, INC.; PUBLIC JUSTICE CENTER, INC.;
MARYLAND CONSUMER RIGHTS COALITION, INC.

*Amici Supporting Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, AT BALTIMORE
THE HONORABLE J. FREDERICK MOTZ, U.S.D.J.

### RESPONSE BRIEF OF APPELLEES

Lawrence S. Greenwald
Catherine A. Bledsoe
Brian L. Moffet
GORDON FEINBLATT  LLC
The Garrett Building
233 East Redwood Street
Baltimore, Maryland 21202
(410) 576-4000
lgreenwald@gfrlaw.com
cbledsoe@gfrlaw.com
bmoffet@gfrlaw.com

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-2160    Caption: Laverne Jones, et al. v. Bernaldo Dancel. et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Bernaldo Dancel
(name of party/amicus)

who is _____ Appellee _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
       financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
       If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
       If yes, identify any publicly held member whose stock or equity value could be affected
       substantially by the outcome of the proceeding or whose claims the trade association is
       pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
       If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: __November 5, 2014__

Counsel for: __Appellee Bernaldo Dancel__

## CERTIFICATE OF SERVICE
**************************

I certify that on __November 5, 2014__ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

See attached.

_____    __November 5, 2014__
        (signature)                        (date)

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this ___5th___ day of November, 2014, a copy of

the foregoing Disclosure of Corporate Affiliations was electronically filed and served on all

counsel of record via the Court CM/ECF system  and was mailed, first-class, postage prepaid, to

      G. Oliver Koppell
      John F. Duane
      Daniel F. Schreck
      Law Office of G. Oliver Koppell & Associates
      99 Park Avenue, Suite 330
      New York, NY 10016

      *Attorneys for Appellants*

                            /s/
                          Brian L. Moffet

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-2160 _____    Caption: Laverne Jones, et al. v. Bernaldo Dancel. et al. _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Amerix Corporation _____
(name of party/amicus)

_____

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      Ascend One Corporation is the parent corporation.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: ___November 5, 2014___

Counsel for: __Appellee Amerix Corporation__

## CERTIFICATE OF SERVICE
****************************

I certify that on __November 5, 2014__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

See attached.

_____
(signature)

__November 5, 2014__
(date)

- 2 -

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this __5th___ day of November, 2014, a copy of

the foregoing Disclosure of Corporate Affiliations was electronically filed and served on all

counsel of record via the Court CM/ECF system  and was mailed, first-class, postage prepaid, to

> G. Oliver Koppell
> John F. Duane
> Daniel F. Schreck
> Law Office of G. Oliver Koppell & Associates
> 99 Park Avenue, Suite 330
> New York, NY 10016
>
> *Attorneys for Appellants*

                                        _____/s/_____
                                        Brian L. Moffet

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2160__    Caption: __Laverne Jones, et al. v. Bernaldo Dancel, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__3C Incorporated__
(name of party/amicus)

_____

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☑YES ☐NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      Ascend One Corporation is the parent corporation.


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
   If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____November 5, 2014_____

Counsel for: _Appellee 3C Incorporated_

## CERTIFICATE OF SERVICE
**************************

I certify that on _November 5, 2014_ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

See attached.

_____               _____November 5, 2014_____
        (signature)                                    (date)

- 2 -

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___5th___ day of November, 2014, a copy of

the foregoing Disclosure of Corporate Affiliations was electronically filed and served on all

counsel of record via the Court CM/ECF system  and was mailed, first-class, postage prepaid, to

> G. Oliver Koppell
> John F. Duane
> Daniel F. Schreck
> Law Office of G. Oliver Koppell & Associates
> 99 Park Avenue, Suite 330
> New York, NY 10016
>
> *Attorneys for Appellants*

<div align="center">

_____/s/_____
Brian L. Moffet

</div>

3507272.1 19541/092504 11/05/2014

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. <u>14-2160</u>    Caption: <u>Laverne Jones, et al. v. Bernaldo Dancel, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>CareOne Services, Inc.</u>
(name of party/amicus)

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:
      Ascend One Corporation is the parent corporation.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: ____November 5, 2014____

Counsel for: __Appellee CareOne Services, Inc.___

# CERTIFICATE OF SERVICE
*****************************

I certify that on ___November 5, 2014___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

See attached.

_____        ____November 5, 2014____
         (signature)                              (date)

- 2 -

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on this   5th   day of November, 2014, a copy of

the foregoing Disclosure of Corporate Affiliations was electronically filed and served on all

counsel of record via the Court CM/ECF system  and was mailed, first-class, postage prepaid, to

      G. Oliver Koppell
      John F. Duane
      Daniel F. Schreck
      Law Office of G. Oliver Koppell & Associates
      99 Park Avenue, Suite 330
      New York, NY 10016

      *Attorneys for Appellants*

                       /s/
                    Brian L. Moffet

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-2160__    Caption: __Laverne Jones, et al. v. Bernaldo Dancel, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Ascend One Corporation__
(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

Appeal: 14-2160    Doc: 10    Filed: 11/05/2014    Pg: 2 of 3

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____       Date: __November 5, 2014__

Counsel for: __Appellee Ascend One Corporation__

## CERTIFICATE OF SERVICE
****************************

I certify that on __November 5, 2014__ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

See attached.

_____                __November 5, 2014__
        (signature)                              (date)

- 2 -

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___5th___ day of November, 2014, a copy of

the foregoing Disclosure of Corporate Affiliations was electronically filed and served on all

counsel of record via the Court CM/ECF system  and was mailed, first-class, postage prepaid, to

> G. Oliver Koppell
> John F. Duane
> Daniel F. Schreck
> Law Office of G. Oliver Koppell & Associates
> 99 Park Avenue, Suite 330
> New York, NY 10016
>
> *Attorneys for Appellants*

_____/s/_____
Brian L. Moffet

3507272.1 19541/092504 11/05/2014

# TABLE OF CONTENTS

                                                                                    **Page**

TABLE OF AUTHORITIES ................................................................ iv

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF ISSUES ................................................................ 1

STATEMENT OF THE CASE ........................................................... 2

    The Arbitration Provision ...................................................... 3

    Debt Management Plans ......................................................... 3

    Plaintiffs' Claims ................................................................... 5

    Post-Hearing Rulings ............................................................. 6

    Damages Ruling ..................................................................... 9

    Attorneys' Fees Ruling ......................................................... 10

SUMMARY OF ARGUMENT ....................................................... 11

ARGUMENT ................................................................................ 14

I.     STANDARD OF REVIEW .................................................... 14

II.    IN DECLINING TO AWARD ACTUAL DAMAGES TO THE
     CLASS UNDER CROA, THE ARBITRATOR NEITHER
     EXCEEDED HIS AUTHORITY NOR MANIFESTLY
     DISREGARDED THE LAW. ................................................. 21

          A.    In Concluding That "Voluntary Contributions" Do
               Not Constitute "Payments" Under Section 1679a(3)
               Or "Amounts Paid" Under Section 1679g(a)(1)(B) of
               CROA, The Arbitrator Correctly Applied Bedrock
               Principles Of Statutory Construction. ...................... 22

3701561.7 19541/092504 01/22/2015

B.    Plaintiffs Failed To Show That The Arbitrator Expressly Ignored Controlling Authority Brought To His Attention That "Voluntary Contributions" Constitute "Payments" or "Amounts Paid" Under CROA ................................................................................29

C.    Plaintiffs Failed To Show That The Arbitrator Expressly Ignored Controlling Authority In Declining To Award Damages Under CROA Based On The Creditors' "Fair Share" Payments, Particularly Where Plaintiffs Represented That They Were Not Seeking Damages Based On "Fair Share" And No Evidence Of Damages Based On "Fair Share" Was Admitted. ...............33

III.    THE ARBITRATOR CORRECTLY EXERCISED HIS DISCRETION AND NEITHER EXCEEDED HIS AUTHORITY NOR MANIFESTLY DISREGARDED THE LAW IN DECLINING TO AWARD CLASS COUNSEL ANY ADDITIONAL ATTORNEYS' FEES AND COSTS. .................................................................35

A.    The Arbitrator Would Have Been Justified In Rejecting Class Counsel's Application In Its Entirety. ............38

B.    The Arbitrator Reduced The Lodestar Amount Because Class Counsel Failed To Satisfy Their Burden Of Demonstrating That The Requested Rates And The Hours Expended Were Reasonable............................41

1.    Plaintiffs Failed To Prove That Class Counsel's Requested Hourly Rates Were Consistent With The "Prevailing Market Rates" in Maryland.................42

2.    Plaintiffs Failed To Prove That The Number Of Hours Expended In The Underlying Arbitration Was Reasonable.............................................................44

3.    The Arbitrator Did Not Double Count The Fees Awarded To Class Counsel In Connection With Prior Settlements.........................................................46

C.    The Arbitrator Did Not Manifestly Disregard The Law By Distinguishing *Perdue*................................................51

3701561.7 19541/092504 01/22/2015

D.     The Arbitrator Did Not Manifestly Disregard The Law In His Application Of The Johnson Guidelines...............53

IV.   PLAINTIFFS FAILED TO SHOW THAT THE DISTRICT COURT ERRED IN RULING THAT THE ARBITRATOR'S DECISIONS WERE "THOUGHTFUL AND WELL CONSIDERED" ...........................55

CONCLUSION ........................................................................................56

CERTIFICATE OF COMPLIANCE .......................................................57

ADDENDUM ..........................................................................................58

3701561.7 19541/092504 01/22/2015

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Law Office of Patrick J. Mulligan,*
  440 F. App'x 612 (10th Cir. 2011) ............................................ 16, 28

*Amerix Corp. v. Jones,* 457 F. App'x 287 (4th Cir. 2011) ........................ 17, 32, 52

*Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir. 1978) .......................................53

*Blum v. Stenson,* 465 U.S. 886 (1984) ...................................................................42

*Bywaters v. United States,* 670 F.3d 1221 (Fed. Cir. 2012) ....................................52

*Citigroup Global Mkts., Inc. v. Bacon,* 562 F.3d 349 (5th Cir. 2009)....................16

*Cole v. Burns Intern. Sec. Services, Inc.,*
  105 F.3d 1465 (D.C. Cir. 1997) ........................................................................17

*CompuCredit Corp. v. Greenwood,* 132 S. Ct. 665 (2012) ....................................27

*Corder v. Brown,* 25 F.3d 833 (9th Cir. 1992) .......................................................49

*CoStar Group, Inc. v. LoopNet, Inc.,* 106 F. Supp. 2d 780
  (D. Md. 2000)...................................................................................... 43, 44

*Data & Dev., Inc. v. InfoKall, Inc.,* 513 F. App'x 117 (2d Cir. 2013) ....................27

*Dewan v. Walia,* 544 F. App'x 240 (4th Cir. 2013) ......................................... 16, 21

*Eastern Associated Coal Corp. v. United Mine Workers of Am.,*
  531 U.S. 57 (2000)............................................................................................15

*Fair Housing Council v. Landow,* 999 F.2d 92 (4th Cir. 1993) ........... 39, 40, 42, 45

*Frazier v. CitiFinancial Corp.,* 604 F.3d 1313 (11th Cir. 2010)............................16

*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991)...............................17

3701561.7 19541/092504 01/22/2015

*Gulf Stream III Associates, Inc. v. Gulfstream Aerospace Corp.*,
    789 F. Supp. 1288 (D.N.J. 1992), *vacated*,
    995 F.2d 414 (3d Cir. 1993)........................................................................ 13, 50

*Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576 (2008).................... 15, 16

*Henry M. Jackson Found. for the Advancement of Military Medicine,*
    *Inc. v. Norwell*, __F. App.'x __, 2015 WL 105696
    (4th Cir. Jan. 8, 2015) ..............................................................................16

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ...................................................... *passim*

*Hughes v. Repko*, 578 F.2d 483 (3d Cir. 1978)......................................................55

*Jackson v. Estelle's Place, LLC*, 391 F. App'x 239
    (4th Cir. 2010)........................................................................ 37, 38, 39, 52

*Jih v. Long & Foster Real Estate, Inc.*, 800 F. Supp. 312
    (D. Md. 1992).................................................................................. 16, 17

*Johnson v. City of Aiken*, 278 F.3d 33 (4th Cir. 2002) ............................................45

*Johnson v. Georgia Highway Express, Inc.*,
    488 F.2d 714 (5th Cir. 1974) ....................................................... 13, 53, 54, 55

*King v. St. Vincent's Hosp.*, 502 U.S. 215 (1991)....................................................26

*Leroy v. City of Houston*, 831 F.2d 576 (5th Cir. 1987)...........................................44

*Lippert Tile Co. v. Int'l Union of Bricklayers and*
    *Applied Craftsmen*, 724 F.3d 939 (7th Cir. 2013) .........................................31

*Long John Silver's Rests., Inc. v. Cole*, 514 F.3d 345 (4th Cir. 2008) ....................17

*Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109 (9th Cir. 2004) ................... 52, 53

*McAfee v. Boczar*, 738 F.3d 81 (4th Cir. 2013) ............................................... 51, 52

*McAfee v. Boczar*, 906 F. Supp. 2d 484 (E.D. Va. 2012*), vacated*,
    738 F.3d 81 (4th Cir. 2013) ....................................................... 53, 54

*McDonnell v. Miller Oil Co., Inc.*, 134 F.3d 638 (4th Cir. 1998)...........................54

*McDow v. Rosado*, 657 F. Supp. 2d 463 (S.D.N.Y. 2009).....................................55

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
  547 U.S. 71 (2006) .................................................................. 25, 26

*Mountaineer Gas Co. v. Oil, Chem., & Atomic Workers Int'l Union,*
  76 F.3d 606 (4th Cir. 1996) .......................................................14

*Mulhall v. Unite Here Local 355,* 667 F.3d 1211 (11th Cir. 2012).................. 24, 25

*In re Nerland Oil, Inc.,* 303 F.3d 911 (8th Cir. 2002) ...............................25

*Norman v. Housing Auth.,* 836 F.2d 1292 (11th Cir. 1988) ......................43

*Northern New England Tel. Operations LLC v. Local 2327,*
  *Int'l Bhd. of Elec. Workers, AFL-CIO,* 735 F.3d 15 (1st Cir. 2013) .................27

*Oxford Health Plans, LLC v. Sutter,* 133 S. Ct. 2064 (2013) ......................... *passim*

*Park Station Ltd. P'ship, LLLP v. Bosse,* 835 A.2d 646 (Md. 2003) .....................25

*Parsons Energy & Chem. Group, Inc. v. Williams Union Boiler,*
  128 F. App'x 920 (3d Cir. 2005) ..................................................52

*Patten v. Signator Ins. Agency, Inc.,*
  441 F.3d 230 (4th Cir. 2006) .....................................................21

*Patterson v. Balsamico,* 440 F.3d 104 (2d Cir. 2006) ...............................30

*Perdue v. Kenny A.,* 559 U.S. 542 (2010)............................................ 13, 38, 51, 52

*Polacsek v. Debticated Consumer Counseling, Inc.,*
  413 F. Supp. 2d 539 (D. Md. 2005)................................................30

*Ramos-Santiago v. UPS,* 524 F.3d 120 (1st Cir. 2008) .............................16

*Remmey v. PaineWebber, Inc.,* 32 F.3d 143 (4th Cir. 1994) ..................... 17, 32, 52

*Robers v. United States,* 134 S. Ct. 1854 (2014) .....................................25

*Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169 (4th Cir. 1994) ..................42

*Saunders v. B.B. & T. Co. of Va.,* 526 F.3d 142 (4th Cir. 2008) ............................30

*Schafer v. Multiband Corp.,* 551 F. App'x 814 (6th Cir. 2014) ..............................28

*Shore v. Groom Law Group,* 877 A.2d 86 (D.C. 2005)..........................................18

- vi -

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987)..................................................41

*Stolt-Nielsen S.A. v. AnimalFeeds Int'lCorp.*, 559 U.S. 662 (2010) .......... 18, 19, 20

*Thompson v. U.S. Dept. of Hous. & Urban Dev.*, No. Civ. A.
    MGJ-95-309, 2002 WL 31777631 (D. Md., Nov. 21, 2002) ............................44

*Three S. Delaware, Inc. v. DataQuick Info. Sys., Inc.*,
    492 F.3d 520 (4th Cir. 2007) .....................................................................32

*In re Total Realty Mgmt., LLC,* 706 F.3d 245 (4th Cir. 2013) ......................... 22, 23

*United States Postal Serv. v. Am. Postal Workers Union*,
    204 F.3d 523 (4th Cir. 2000) .....................................................................14

*United States v. Cobler*, 748 F.3d 570 (4th Cir. 2014) ...........................................16

*Upshur Coals Corp. v. UMWA, Dist. 31*, 933 F.2d 225 (4th Cir. 1991) .......... 17, 38

*In re Vitamin C Antitrust Litig.*, Nos. 06-MD-1738 (BMC) (JO),
    05-C-453, 2013 WL 6858853 (E.D. N.Y. Dec. 30, 2013)........................... 48, 49

*Von Clark v. Butler*, 916 F.2d 255 (5th Cir. 1990) ................................................55

*Wachovia Securities, LLC v. Brand*, 671 F.3d 472 (4th Cir. 2012)................. *passim*

*Walker v. U.S. Dept. of Housing and Urb. Dev.*,
    99 F.3d 761 (5th Cir. 1996) .......................................................................44

*Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*,
    304 F.3d 200 (2d Cir. 2002)........................................................................31

**Statutes**

9 U.S.C. § 10 ..................................................................................................... 15, 16

9 U.S.C. § 10(a)(3) ................................................................................................ 15

9 U.S.C. § 10(a)(4)................................................................................................15

15 U.S.C. §§ 1679, *et seq.*......................................................................................1

15 U.S.C. § 1679a(3)(A) ............................................................................... *passim*

15 U.S.C. § 1679b(b) ....................................................................................... 25, 26

15 U.S.C. § 1679c. ..................................................................8

15 U.S.C. § 1679d. ..................................................................8

15 U.S.C. § 1679e. ..................................................................8

15 U.S.C. § 1679g(a)(1) ................................................... *passim*

15 U.S.C. § 1679g(a)(1)(B) ............................................. *passim*

15 U.S.C. §§ 1692, *et seq.* ......................................................5

15 U.S.C. §§ 1961, *et seq.* ......................................................5

15 U.S.C. §§ 6101, *et seq.* ......................................................5

28 U.S.C. § 1291 ......................................................................1

28 U.S.C. § 1331 ......................................................................1

28 U.S.C. § 1332(a) ..................................................................1

Md. Code Ann., Comm. Law §§ 13-301, *et seq.* ...................5

Md. Code Ann., Fin. Inst. §§ 12-901, *et seq.* ...................5, 31

Md. Code Ann., Fin. Inst. § 12-918(f) ..................................32

**Other Authorities**

*American Heritage Dictionary of the English Language* (3d ed. 1992)..................24

Black's Law Dictionary 595 (10th ed. 2014)..........................................25

3701561.7 19541/092504 01/22/2015

## JURISDICTIONAL STATEMENT

This is an appeal from an order by Judge Motz of the United States District Court for the District of Maryland, denying Plaintiffs-Appellants' motion to vacate, in part, an arbitration award.  (JA 441-42).

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  The case is a civil action between citizens of different states and the amount in controversy exceeds $75,000.  (JA 8-11, ¶¶ 4-6, 8-13, 15).  The district court also had jurisdiction pursuant to 28 U.S.C. § 1331 because the underlying complaint for arbitration asserts claims under federal law, including the Credit Repair Organizations Act, 15 U.S.C. §§ 1679, *et seq.* ("CROA").  (JA 11, ¶ 14).

This Court has jurisdiction over Plaintiffs' appeal pursuant to 28 U.S.C. § 1291.  The district court's order dated October 20, 2014, is a final order. Plaintiffs filed a timely notice of appeal on October 27, 2014.  (JA 443-44).

## STATEMENT OF ISSUES

1.     Did the Arbitrator exceed his authority or manifestly disregard the law by declining to award Class Members actual damages under CROA where Plaintiffs failed to prove that any Class Member sustained actual damages and the Arbitrator concluded that "voluntary contributions" made by some Class Members were not "payments" or "amounts paid" within the meaning of CROA?

2.     Did the Arbitrator exceed his authority or manifestly disregard the law by declining to award Class Counsel any additional fees or costs beyond

the $2.6 million they had already received in connection with two prior settlements where Class Counsel (a) failed to meet their burden of establishing which of the hours and costs in their application were attributable to their one partially successful claim, as opposed to their eight unsuccessful claims, (b) failed to prove that their requested hourly rates were consistent with prevailing market rates in Maryland, and (c) submitted time records that were replete with "block billing," "questionable entries," "vague, unnecessary, and unreasonable time entries," and unnecessary or extravagant expenses?

   3. Did the district court err in ruling that the Arbitrator's decisions were "thoughtful and well-considered"?

## STATEMENT OF THE CASE

   This case involves a class arbitration initiated by Plaintiffs against Genus Credit Management Corporation ("Genus"), American Financial Solutions ("AFS"), and Defendants/Appellees Bernaldo Dancel ("Mr. Dancel"), Amerix Corporation ("Amerix"), 3CI, Inc. ("3CI"), CareOne Services, Inc. ("CareOne"), and Ascend One Corporation ("Ascend One") (collectively, "Defendants"). Genus and AFS are independent, non-profit credit counseling agencies ("CCAs") that provided debt management services to consumers in financial trouble. (JA 30, ¶ 8; JA 38, ¶ 38; JA 42, ¶ 54). Amerix is a for-profit corporation founded by Mr.

Dancel that provided back-office services to a number of CCAs, including Genus and AFS. (JA 34-5, ¶¶ 19, 23).

## The Arbitration Provision

Plaintiffs and Class Members are consumers who enrolled in debt management plans with Genus or AFS between July 1, 1998 and May 31, 2003 (JA 33, ¶ 17), whose contracts contained the following arbitration provision:

> Any dispute between us that cannot be amicably resolved, and all claims or controversies arising out of this Agreement, shall be settled solely and exclusively by binding Arbitration in the City of Columbia, Maryland, administered by, and under the Commercial Arbitration Rules then prevailing of, the American Arbitration Association . . . .

(JA 31, ¶ 8 n.7; JA 232, ¶ 18; JA 234, ¶ 18).

## Debt Management Plans

A debt management plan ("DMP") is a means for a consumer to restructure and pay down his unsecured debt – usually credit card debt. (JA 30-31, ¶ 8 n.5; JA 45, ¶¶ 67-9). A DMP involves four parties: (1) the consumer, (2) those of the consumer's creditors that choose to participate in the DMP, (3) the CCA (here, Genus or AFS), and (4) in some instances, the company providing back-office services to the CCA (here, Amerix). (JA 30-31, ¶ 8 n.5). The consumer's payments are consolidated into a single, monthly payment, which the CCA receives from the consumer and then distributes to the participating creditors each month. (*Id.*).

- 3 -

Consumers who enrolled in DMPs with Genus and AFS were encouraged to include "voluntary contributions" with their monthly payments to the CCA. (JA 45-6, ¶¶ 69, 74). While some Class Members made "voluntary contributions" with every monthly payment, many did not include a "voluntary contribution" in one or more of their monthly payments, and some never made any "voluntary contribution" whatsoever. (JA 55, ¶ 122). Class Members who did not make "voluntary contributions" received the same DMP services as those who made contributions. (JA 55, ¶ 119).

In addition to receiving "voluntary contributions" from some consumers, the CCAs received "fair share" payments from some of the consumers' creditors. (JA 56, ¶¶ 124-26). "Fair share" is a donation made by a creditor to a CCA for payments received by the creditor on behalf of a debtor enrolled in a DMP. Typically, "fair share" is a percentage of the dollar amount of the payment the CCA sends to the creditor on behalf of the debtor enrolled in the DMP. (JA 227, lines 2-15). "Fair share" payments have no impact on the consumer because the creditor credits the consumer with the full amount paid by the consumer on the DMP each month, with no deduction for the amount of "fair share" paid by the creditor to the CCA. (JA 232, ¶ 12; JA 234, ¶ 12; JA 247, line 9 – JA 249, line 5). Those creditors that paid "fair share" did so because the CCA provided a service to

- 4 -

the creditor by helping the debtor enrolled on a DMP pay his or her debt. (JA 232, ¶ 12; JA 234, ¶ 12).

**Plaintiffs' Claims**

Plaintiffs asserted nine claims, including claims under CROA, the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.* ("FDCPA"), the Racketeer Influenced and Corrupt Organizations Act, 15 U.S.C. §§ 1961, *et seq.* ("RICO"), the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101, *et seq.* ("TCFAPA"), the Maryland Consumer Protection Act, Md. Code Ann., Comm. Law §§ 13-301, *et seq.* ("MCPA"), the Maryland Debt Management Services Act, Md. Code Ann., Fin. Inst. §§ 12-901, *et seq.* ("MDMSA"), and common law claims for breach of fiduciary duty, fraud, and unjust enrichment. (JA 30, ¶ 6). All claims arose out of Plaintiffs' dissatisfaction with their DMPs. (JA 31, ¶ 9). Plaintiffs sought to represent a nationwide class of consumers on all claims and sought damages in excess of $270 million. (JA 255, line 19 – JA 256, line 2; JA 267, line 14 – JA 268, line 8).

The Arbitrator certified a class on Plaintiffs' CROA, RICO, and MCPA claims, denied class certification on Plaintiffs' MDMSA, fraud, and breach of fiduciary duty claims, and entered summary judgment for Defendants on Plaintiffs' FDCPA, TCFAPA, and unjust enrichment claims. (JA 294-99; JA 306-7; JA 310; JA 312-13).

- 5 -

Before the final merits hearing, Genus and AFS settled with Plaintiffs and the Class. (JA 34, ¶ 18 n. 9). The claims that remained against Defendants at the time of the final hearing were class claims under CROA, RICO, and MCPA, and individual claims for violation of the MDMSA, breach of fiduciary duty, and fraud.

## Post-Hearing Rulings

The final merits hearing took place over sixteen days and generated a transcript containing over 5,000 pages of testimony and 3,000 pages of exhibits. (JA 29, ¶ 4 n.2). Following extensive post-trial briefing, the Arbitrator decertified the class with respect to Plaintiffs' RICO and MCPA claims and held that Plaintiffs' individual CROA disclosure claims were time-barred. (JA 329-35; JA 353).

Thereafter, the Arbitrator issued a series of rulings, with briefing and argument before each one: Liability Rulings in Anticipation of the Final Award ("Liability Ruling") (JA 28-78); Ruling on Punitive Damages ("Damages Ruling") (JA 79-85); and Ruling on Attorneys' Fee Application ("Attorneys' Fees Ruling") (JA 87-105). All three rulings were combined in the Final Arbitration Award. (JA 26-105).

In the final analysis, Plaintiffs' success on the merits proved modest. Out of their initial nine claims and their request for $270 million in compensatory

- 6 -

damages, with the possibility of treble and punitive damages, Plaintiffs succeeded on only one portion of one claim and received an award of $1.9 million in punitive damages against Mr. Dancel and Amerix, payable to two *cy pres* recipients. Specifically, Plaintiffs lost their individual and class claims under RICO and MCPA and their individual claims for violation of the MDMSA, breach of fiduciary duty, and fraud. (JA 72-78, ¶¶ 214–44).

With respect to Plaintiffs' class claims under CROA, the Arbitrator rejected all but one. Specifically, he held that Defendants did not violate CROA by entering into Service Agreements with Genus and AFS (JA 41- 2, ¶¶ 52, 55), did not disregard corporate formalities (JA 43-5, ¶¶ 59, 61, 66), did not make material misrepresentations or omissions (JA 61, ¶ 155; JA 68, ¶ 190; JA 73, ¶ 220; JA 76, ¶ 237; JA 77, ¶ 242), did not force consumers to make "voluntary payments" (JA 54, ¶ 116; JA 55-6, ¶¶ 119-23; JA 69, ¶ 194), did not receive a private inurement or benefit so as to vitiate Genus's and AFS's status as bona fide non-profits (JA 51-2, ¶¶ 101, 103, 106), and did not cause Class Members to suffer actual harm. (JA 68-9, ¶¶ 191, 194). Indeed, the Arbitrator acknowledged that Defendants had, in fact, helped hundreds of thousands of consumers with their credit card debt. JA 36, ¶ 31 (Mr. Dancel "started out to do good and stayed on to do both good and well"); JA 42, ¶ 53 (Defendants "apparently helped hundreds of thousands of consumers"); JA 59, ¶ 141 ("The record of this arbitration shows that

- 7 -

[Defendants] did, to a very great extent, provide help to consumers in dealing with their credit card debt.").

The Arbitrator found only one area of noncompliance:[1] the failure to provide the pre-contract disclosures, notice of cancellation, and form contract mandated by Sections 1679c, 1679d, and 1679e of CROA ("Technical Violations") (JA 46, ¶ 73; JA 70-1, ¶ 199) – a failure Defendants never contested (JA 46, ¶ 73) because, as the Arbitrator found, they believed "in good faith" that they were not governed by CROA.[2]  (JA 48, ¶ 84).  *See also* JA 76, ¶ 237 (Defendants "did not, however, make misrepresentations or commit fraud; they made an error of

---

[1] The Arbitrator found that Defendants also failed to disclose that creditors made "fair share" payments to the CCAs for those debtors participating in DMPs. (JA 57-8, ¶ 135; JA 59, ¶ 140; JA 62, ¶¶ 156, 158).  However, after Defendants pointed out that the "fair share" arrangement was disclosed to Class Members in the terms included in every DMP agreement (JA 232 and 234, ¶ 12), the Arbitrator acknowledged his ruling on this point was a mistake. (JA 82, ¶ 9).

[2] Throughout their Brief, Plaintiffs mischaracterize the Arbitrator's rulings. Contrary to Plaintiffs' contention that Mr. Dancel, Amerix, 3CI, and CareOne were all found liable of violating CROA (Appellants' Brief at 4, 7, 21), the Arbitrator found only Mr. Dancel and Amerix liable and assessed punitive damages against them alone.  (JA 79, ¶ 1; JA 81, ¶ 6).  While the Arbitrator did find that 3CI and CareOne were credit repair organizations ("CROs") (JA 49-50, ¶¶ 91, 93; JA 58, 136), he did not find that they violated CROA.  Indeed, he found that 3CI and CareOne were not involved with Class Members or in a position to have made the Technical Violations.  *See* JA 35, ¶¶ 24, 26 (there is no evidence that Claimants purchased CareOne's services, and Claimants assert no claim regarding CareOne's services), JA 35, ¶ 24 (3CI did not provide any credit counseling services to consumers), JA 49, ¶ 90 (3CI had no relationships with Class Representatives and no role in servicing their DMPs).  The role of these two Defendants was limited to advertising for AFS (in the case of 3CI) and referring consumers to CCAs generally (in the case of CareOne).  (JA 49-50, ¶¶ 90-1, 93).

3701561.7 19541/092504 01/22/2015

judgment as to whether they needed to comply with CROA"). The Arbitrator noted that even the Technical Violations were of limited consequence: "Liability Respondents did make some disclosures. The Terms of Debt Management [sent to every DMP client] discussed much of what is required under CROA, and much of the remainder of the required language is not relevant to Liability Respondents' DMP business." (JA 82, ¶ 8).

**Damages Ruling**

The Arbitrator concluded that Plaintiffs had failed to demonstrate that Class Members suffered any actual damages as a result of the Technical Violations. (JA 68, ¶ 191; JA 82, ¶ 12). Moreover, there was no evidence in the record from which to determine damages based on creditors' "fair share" payments (JA 70, ¶¶ 196-98), and Plaintiffs had specifically represented to the Arbitrator that they were seeking damages based on "voluntary contributions" alone and not on "fair share." (JA 70, ¶ 198; *see also* JA 357, lines 15-19; JA 363, lines 8-11; JA 367, line 1 – JA 368, line 16; JA 372, lines 1-4). The Arbitrator rejected Plaintiffs' argument that Defendants should be required to return "voluntary contributions" made by some Class Members on the ground that "voluntary contributions" were, in fact, voluntary and not "payments" or "amounts paid" within the meaning of CROA because they were not made in exchange for the performance of services. (JA 54-6, ¶¶ 115-23; JA 68-9, ¶¶ 191-4).

- 9 -

The Arbitrator awarded punitive damages of $1,948,264 against only two Defendants – Mr. Dancel and Amerix (JA 79, ¶ 1; JA 81, ¶ 6). He directed payment of the punitive damages to two *cy pres* recipients (JA 83-4, ¶¶ 15-20) and granted Plaintiffs, as Class Representatives, modest incentive awards. (JA 85, ¶ 21).

**Attorneys' Fees Ruling**

With respect to attorneys' fees and costs, Class Counsel submitted billing records purportedly supporting a lodestar of $7,579,843.50 in fees and $338,172.48 in costs, representing every hour Class Counsel had put into the arbitration, including prior and related judicial proceedings, with no reduction for claims that were ultimately unsuccessful.[3]  (JA 87-8, ¶ 1; JA 91-3, ¶¶ 9, 11). Moreover, Class Counsel's billing records did not permit the Arbitrator to segregate the fees and costs attributable to their one partially successful claim from the fees and costs attributable to their eight unsuccessful claims. The Arbitrator concluded that Plaintiffs failed to meet their burden of establishing that their requested fees and costs were either "reasonable" (JA 97-100, ¶¶ 20-3; JA 102-3, ¶ 32) or attributable to their only "successful" claim. (JA 91-5, ¶¶ 9-15).  Armed

---

[3] The Arbitrator noted that Class Counsel agreed to subtract from the lodestar the $2,666,666 in fees Class Counsel received in connection with the settlements with Genus and AFS, although Class Counsel "seem[ed] to contend" that such a reduction was not required. (JA 88, ¶ 1).

with a "machete rather than a scalpel" (JA 104, ¶ 36) as a result of Class Counsel's poor record-keeping, the Arbitrator subtracted $75,612.50 from the lodestar based on Class Counsel's withdrawal of their claim for Jack Sando's fees (JA 88, ¶ 1), reduced the remaining lodestar of $7,504,231 in fees and $338,172.48 in expenses by two-thirds, subtracted the $2,666,666 in fees that Class Counsel received from the prior settlements, and determined that Class Counsel had already received all the fees and costs to which they were entitled. (JA 104-05, ¶¶ 36-37).

## SUMMARY OF ARGUMENT

The overriding question on this appeal is not whether the Arbitrator was right or wrong but whether he exceeded his authority or acted in manifest disregard of the law. The Arbitrator did not exceed his authority because, under the arbitration agreement, he was authorized to resolve "any dispute" between the parties and "all claims or controversies" arising out of the DMP Agreement. He did not manifestly disregard the law because, in making his rulings on damages and attorneys' fees and costs, the Arbitrator did not refuse to heed any controlling legal principle or indicate that he was aware of the law, understood it correctly, found it to be applicable, and yet chose to ignore it in propounding his decision.

In declining to award actual damages under CROA, the Arbitrator applied bedrock principles of statutory construction. CROA defines "actual damages" as "the greater of" (a) "the amount of any actual damage sustained by

- 11 -

[Class Members] as a result of [the CROA violation]" or (b) "any amount paid [by Class Members] to the [CRO]." 15 U.S.C. § 1679g(a)(1). Because Plaintiffs failed to prove that any Class Member sustained actual damages as a result of the Technical Violations, the Arbitrator focused on the "amount paid" by Class Members.

Plaintiffs argued that "voluntary contributions" made by some Class Members should be considered "amounts paid" to Defendants and awarded as damages. The Arbitrator disagreed. After undertaking a thorough analysis of the meaning of the terms "payment" and "amount paid" in CROA and considering the evidence relating to "voluntary contributions," he concluded that "voluntary contributions" were neither "payments" under § 1679a(3)(A) nor "amounts paid" under § 1679g(a)(1)(B) because the "voluntary contributions" were not mandatory payments made in order to receive DMP services. Although Plaintiffs argue that the Arbitrator's statutory construction was incorrect, legal error is not grounds for vacating his award.

Plaintiffs' post hoc argument that the Arbitrator should have awarded "fair share" payments as damages is baseless. Plaintiffs repeatedly represented to the Arbitrator that they were not seeking damages based on "fair share," and they failed to adduce evidence sufficient to enable the Arbitrator to award "fair share" as damages. Moreover, the plain language of CROA limits damages to the

- 12 -

amounts paid *by the persons injured by the CROA violation to the CRO*, and "fair share" payments were not made by the persons allegedly injured by the CROA violation – *i.e.*, Class Members – but, instead, were made by Class Members' *creditors*.

Class Counsel's argument that the Arbitrator exceeded his authority or manifestly disregarded the law when he declined to award Class Counsel any additional attorneys' fees and costs beyond the $2.6 million they received from the two prior settlements is similarly groundless. Although the Arbitrator would have been justified in rejecting Class Counsel's fee application in its entirety, he engaged in a painstaking analysis of the evidence and applicable law and properly reduced the lodestar to account for the many problems with Class Counsel's billing records and Plaintiffs' lack of success on the merits.  As discussed below, Plaintiffs' arguments that the Arbitrator improperly distinguished *Perdue v. Kenny A.*, 559 U.S. 542 (2010), improperly relied on *Gulf Stream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 789 F. Supp. 1288 (D.N.J. 1992), and failed to properly apply *Johnson v. Georgia Highway Express, Incorporated*, 488 F.2d 714 (5th Cir. 1974), do not meet the standards for vacating an arbitral award.

- 13 -

# **ARGUMENT**

## I.    STANDARD OF REVIEW

This Court reviews the district court's denial of Plaintiffs' motion to vacate, in part, the arbitral award *de novo*. *Wachovia Securities, LLC v. Brand*, 671 F.3d 472, 478 (4th Cir. 2012).

"[J]udicial review of arbitration awards is . . . among the narrowest known to the law." *United States Postal Serv. v. Am. Postal Workers Union*, 204 F.3d 523, 527 (4th Cir. 2000).  "A court sits 'to determine only whether the arbitrator did his job – not whether he did it well, correctly, or reasonably, but simply whether he did it.'" *Id.*  (quoting *Mountaineer Gas Co. v. Oil, Chem., & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996)).   As this Court recently explained:

> The FAA notably does not authorize a district court to overturn an arbitral award just because it believes, however strongly, that the arbitrators misinterpreted the applicable law.  When parties consent to arbitration, and thereby consent to extremely limited appellate review, they assume the risk that the arbitrator may interpret the law in a way with which they disagree.  Any more probing review of arbitral awards would risk changing arbitration from an efficient alternative to litigation into a vehicle for protracting disputes.

*Brand*, 671 F.3d at 479 n.5 (internal citations omitted).

A party seeking to vacate an arbitral award on the ground that the arbitrator exceeded his authority "bears a heavy burden."  *Oxford Health Plans,*

- 14 -

*LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013). "It is not enough . . . to show that the [arbitrator] committed an error – or even a serious error." *Id.* (citation omitted). "Only if 'the arbitrator act[s] outside the scope of his contractually delegated authority' – issuing an award that 'simply reflect[s] [his] own notions of [economic] justice' rather than 'draw[ing] its essence from the contract' – may a court overturn his determination." *Sutter*, 133 S. Ct. at 2068 (quoting *Eastern Associated Coal Corp. v. United Mine Workers of Am.*, 531 U.S. 57, 62 (2000)).

Plaintiffs also argue that the Arbitrator acted in "manifest disregard of the law." Appellants' Brief at 18-19. Although Defendants are mindful that three panels of this Court have held that "manifest disregard" remains a viable basis for overturning an arbitral award in the wake of *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 586-90 (2008),[4] at least three other federal appellate courts

---

[4] In *Hall Street*, the Supreme Court held that the FAA provides the "exclusive" grounds for modifying or vacating an arbitral award. The Court noted, without deciding, that courts' long-standing use of the "manifest disregard" standard for vacating arbitral awards *could be* a shorthand reference to the grounds for vacatur embodied in FAA § 10(a)(3) and § 10(a)(4), as opposed to a non-statutory or common law ground for vacating arbitral awards. *Id.* at 585. In the wake of *Hall Street*, there has been uncertainty as to whether "manifest disregard" remains a viable basis for challenging an arbitral award. *See Brand,* 671 F.3d at 481 n. 7 (noting split among federal appellate courts). Because this Court has found that "manifest disregard continues to exist as either an independent ground for review or as a judicial gloss" on the enumerated grounds for vacatur set forth in 9 U.S.C. § 10 (*Brand,* 671 F.3d at 483), Defendants will address the standard here.

Plaintiffs also argue that the Arbitrator's award should be vacated because it is "irrational." Appellants' Brief at 2-3, 18-19. To the extent "irrationality"

- 15 -

have held to the contrary.  *Compare Henry M. Jackson Found. for the Advancement of Military Medicine v. Norwell*, __F. App.'x __, 2015 WL 105696, *1 n.1 (4th Cir. Jan. 8, 2015); *Dewan v. Walia*, 544 F. App'x 240, 246 n.5 (4th Cir. 2013); and *Brand,* 671 F.3d at 483[5] *with Citigroup Global Mkts., Inc. v. Bacon*, 562 F.3d 349, 358 (5th Cir. 2009); *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1323-24 (11th Cir. 2010); and *Ramos-Santiago v. UPS*, 524 F.3d 120, 124 n.3 (1st Cir. 2008) (dicta).  Defendants contend that, by reason of *Hall Street* and these other authorities, the FAA provides the exclusive basis for vacating an arbitral award.  However, assuming "manifest disregard" remains a viable standard, Plaintiffs have fallen far short of meeting their "heavy burden" to establish it here.

In order to show that the Arbitrator manifestly disregarded the law, it is not enough to show that his award "resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusion."  *Jih v. Long & Foster Real*

---

survives as a basis for vacating an arbitral award, it should be considered synonymous with "exceeding authority" or "manifest disregard."  *See Abbott v. Law Office of Patrick J. Mulligan*, 440 F. App'x 612, 622 & n. 18 (10th Cir. 2011) ("[T]he distinction between 'irrationality' and 'manifest disregard' seems to lie in whether the arbitrators disregarded the terms of the contract as opposed to the rule of law. . . . 'Irrationality' is confined to an arbitration panel's complete departure from the terms of the agreement subject to arbitration.  Only then will the arbitrators have exceeded their authority under § 10.").

[5] In this Circuit, the first case to decide an issue controls later consideration of that issue, unless the case is overruled by the Court sitting *en banc* or by the Supreme Court.  *United States v. Cobler*, 748 F.3d 570, 577 (4th Cir. 2014).

*Estate, Inc.*, 800 F. Supp. 312, 320 (D. Md. 1992) (quoting *Upshur Coals Corp. v. UMWA, Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991)). Rather, it must be shown that the Arbitrator was "'aware of the law, understood it correctly, found it applicable to the case before [him], and yet chose to ignore it in propounding [his decision].'" *Amerix Corp. v. Jones*, 457 F. App'x 287, 291 (4th Cir. 2011) (quoting *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 149 (4th Cir. 1994)). In other words, Plaintiffs must establish that "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[] refused to heed that legal principle." *Brand,* 671 F.3d at 483 (quoting *Long John Silver's Rests., Inc. v. Cole*, 514 F.3d 345, 349-50 (4th Cir. 2008)).[6]

---

[6] Plaintiffs argue that a stricter standard of review applies when the arbitral award involves a statutory claim. Appellants' Brief at 19-20. The cases they cite do not support this proposition. In *Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 20 (1991), the Supreme Court held that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Nothing in that opinion remotely suggests that an arbitral award involving a statutory claim is subject to a stricter standard of review than the standards set forth in § 10 of the FAA. The same is true of *Cole*. In the passage cited by Plaintiffs, the Court rejected an argument that the arbitrator exceeded his authority by applying the opt-out class certification provision of the AAA Class Rules, rather than the opt-in class provision of the Fair Labor Standards Act ("FLSA") in class arbitration proceedings involving the FLSA, where there was no indication that Congress intended to preclude parties from waiving the opt-in procedure for class arbitration of FLSA claims. *Cole*, 514 F.3d at 350.

Like Plaintiffs, Amici seek to invoke a stricter standard of review than that set forth in the FAA and established case law. Amici cite *Cole v. Burns International Security Services, Inc.*, 105 F.3d 1465 (D.C. Cir. 1997) for the proposition that, under the "manifest disregard" standard, judicial review of

- 17 -

The Supreme Court's latest pronouncement on the standard of review governing arbitral awards illustrates just how narrow that standard is. In *Oxford Health Plans, LLC v. Sutter*, 133 S. Ct. 2064 (2013), the parties agreed that an arbitrator should decide whether their arbitration agreement authorized class arbitration. *Id.* at 2067. The arbitrator held that it did, even though the contract did not mention class arbitration. *Id.* When the Supreme Court subsequently held, in *Stolt-Nielsen S.A. v. AnimalFeeds International Corporation*, 559 U.S. 662, 671 (2010), that a party may not be compelled to submit to class arbitration unless there is a contractual basis for concluding that the parties *agreed* to do so, the parties asked the arbitrator to reconsider his ruling. *Sutter*, 133 S. Ct. at 2067. The arbitrator did and determined that *Stolt-Nielsen* had no effect on his ruling. *Id.*

The defendant sought to vacate the arbitrator's ruling on the ground that he had exceeded his authority by badly misinterpreting the contract and *Stolt-Nielsen*. Under the limited judicial review applicable to arbitral awards, the Supreme Court framed its inquiry as follows: "[T]he sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether

---

arbitral awards involving statutory claims is "meaningful" and "rigorous." Amicus Brief at 17-18. However, neither the Supreme Court nor this Court has adopted that standard. Even in the District of Columbia, the state's highest court has held that *Cole's* "heightened scrutiny" is limited to those claims in which an employee is compelled as a condition of employment to arbitrate certain statutory claims. *Shore v. Groom Law Group,* 877 A.2d 86, 92 n. 9 (D.C. 2005).

- 18 -

he got its meaning right or wrong." *Id.* at 2068 (footnote omitted). Although the Court might not have agreed with the arbitrator's interpretation of the parties' contract, that disagreement was not a basis for vacating his decision:

> It is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. The arbitrator's construction holds, however good, bad, or ugly.

*Id.* at 2070-71 (internal quotation marks and citations omitted).

The same holds true of an arbitrator's construction and application of the law. *Brand*, 671 F.3d at 479 n.5. Here, Plaintiffs bargained for the Arbitrator to construe and apply CROA and to determine whether Plaintiffs were entitled to reasonable attorneys' fees and costs for any successful claim. Because the Arbitrator did what he was tasked to do under the arbitration clause – namely, resolved "[a]ny dispute" between the parties and "all claims or controversies arising out of this [DMP] Agreement" (JA 232, ¶ 18; JA 234, ¶ 18) – he did not exceed his authority or manifestly disregard the law. Whether the Arbitrator applied the law correctly is irrelevant. His construction holds, "however good, bad, or ugly." *Sutter*, 133 S. Ct. at 2070-71.

The rare circumstances in which this Court or the Supreme Court has vacated an arbitral award are patently different from the case at hand. In *Stolt-Nielson*, the parties had entered into an unusual stipulation that they never reached

- 19 -

agreement on class arbitration. 559 U.S. at 668-69, 673. Under those circumstances, the arbitration panel should have determined the rule of law that governs in the absence of an agreement, either by looking to the FAA or to one of the two bodies of law that the parties claimed governed – *i.e.*, either federal maritime or New York law. *Id.* at 673. Instead of doing either, the panel held that the parties' arbitration agreement should be construed to permit class arbitration as a matter of public policy. *Id.* In other words, the panel "proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation." *Id.* at 673-74. The Supreme Court overturned the arbitral decision "because it lacked *any* contractual basis for class procedures, not because it lacked . . . a 'sufficient' one." *Sutter*, 133 S. Ct. at 2069. As the Court explained in *Sutter*:

> In *Stolt-Nielsen*, the arbitrators did not construe the parties' contract, and did not identify any agreement authorizing class proceedings. So in setting aside the arbitrators' decision, we found not that they had misinterpreted the contract, but that they had abandoned their interpretive role. Here, the arbitrator did construe the contract . . . and did find an agreement to permit class arbitration. So to overturn his decision, we would have to rely on a finding that he misapprehended the parties' intent. But § 10(a)(4) bars that course: It permits courts to vacate an arbitral decision only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly.

*Sutter*, 133 S. Ct. at 2070.

- 20 -

In *Patten v. Signator Insurance Agency, Incorporated*, 441 F.3d 230 (4th Cir. 2006), this Court vacated an arbitration award where the arbitrator rewrote the parties' contract to incorporate a limitations provision. *Id.* at 236. By amending the agreement, rather than interpreting it, the arbitrator exceeded his authority. *Id.* Similarly, in *Dewan v. Walia*, 544 F. App'x 240 (4th Cir. 2013), this Court vacated an arbitration award that recognized the validity of an employee's release of all claims arising out of his prior employment and yet allowed the employee to assert such a claim in arbitration. *Id.* at 245-47. As in *Patten*, this Court concluded that the arbitrator "rewrote the release" and thus exceeded his authority. *Id.* at 247.

Here, the Arbitrator neither rewrote the parties' agreement nor ignored controlling law and "proceeded as if [he] had the authority of a common-law court to develop what [he] viewed as the best rule" as a matter of public policy. Rather, he undertook a thoughtful analysis of applicable law, construed it, and made an award by applying the law to the facts. Under these circumstances, there is no basis for vacating his decision.

## II. IN DECLINING TO AWARD ACTUAL DAMAGES TO THE CLASS UNDER CROA, THE ARBITRATOR NEITHER EXCEEDED HIS AUTHORITY NOR MANIFESTLY DISREGARDED THE LAW.

Plaintiffs contend the Arbitrator was required to award Class Members "actual damages," which are defined in CROA as "the greater of" (a) "the amount of any actual damage sustained by [the Class Members] as a result

- 21 -

of [the CROA violation]" or (b) "any amount paid [by Class Members] to the [CRO]."   15 U.S.C. § 1679g(a)(1).   Because Plaintiffs failed to prove that any Class Member sustained actual damages as a result of the Technical Violations (JA ¶ 191; JA 68, ¶ 12), the Arbitrator focused on the "amount paid" by Class Members.

Plaintiffs argued that "voluntary contributions" made by some Class Members should be considered "amounts paid" to Defendants.   The Arbitrator disagreed.   After examining the meaning of the terms "payment" and "amount paid" under CROA and considering the evidence relating to "voluntary contributions" (JA 54-56, ¶¶ 115-23; JA 68-69, ¶¶ 191-94), he concluded that "voluntary contributions" were neither "payments" under § 1679a(3)(A) nor "amounts paid" under  § 1679g(a)(1)(B) because the "voluntary contributions" were not mandatory payments made in order to receive DMP services.  (JA 55-56, ¶ 123; JA 69, ¶ 194).

> **A.    In Concluding That "Voluntary Contributions" Do Not Constitute "Payments" Under Section 1679a(3) Or "Amounts Paid" Under Section 1679g(a)(1)(B) of CROA, The Arbitrator Correctly Applied Bedrock Principles Of Statutory Construction.**

The principles of statutory interpretation are well established:

When interpreting a statute, we begin with the plain language.  In doing so, we give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import.  To determine a statute's plain meaning, we not only look to the language itself, but also the specific context in which

- 22 -

that language is used, ***and the broader context of the statute as a whole.***

*In re Total Realty Mgmt., LLC,* 706 F.3d 245, 251 (4th Cir. 2013) (internal quotation marks citations omitted) (emphasis added).

Here, the Arbitrator started with the plain meaning of "payment" as it appears in § 1679a(3)(A) of CROA, defining a CRO:

> The term "credit repair organization" –
>
> (A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the ***payment*** of money or other valuable consideration, for the express or implied purpose of
>
>   (i)   improving any consumer's credit record, credit history, or credit rating; or
>
>   (ii)  providing advice or assistance to any consumer with regard to any activity or service described in clause (i) . . . .

(emphasis added). The Arbitrator concluded that "payment" as used in CROA is "an element of the *quid pro quo* from a consumer in order to obtain a defined credit service." (JA 54, ¶ 116). He noted that his construction was "consistent with the definition of a 'payment' in Black's Law Dictionary as 'fulfillment of a promise or the performance of an agreement,' or as 'a discharge of an obligation or debt.'" (*Id.*). Because Class Members were not required to make "voluntary contributions" in order to receive DMP services, the "voluntary contributions"

- 23 -

were not "part of a *quid pro quo*" and not "a discharge of an obligation or debt" and thus were not "payments" under CROA. (*Id.*). And because "voluntary contributions" were not "payments," they did not fall within the scope of the damages provision ("any amount **paid** by the person to the [CRO]") under § 1679g(a)(1) of CROA:

> (a) Liability established
>
> Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
>
> > (1) Actual damages
> >
> > The greater of:
> >
> > > (A)   the amount of any actual damage sustained by such  person as a result of such failure; or
> > >
> > > (B)   ***any amount paid by the person to the credit repair organization.***

15 U.S.C. § 1679g(a)(1) (emphasis added).[7]

The Arbitrator's interpretation of "payment" is consistent not only with the ordinary, dictionary meaning of the word but also with other courts' interpretations of the term. *See, e.g., Mulhall v. Unite Here Local 355*, 667 F.3d 1211, 1215 (11th Cir. 2012) ("Whether something qualifies as a payment depends

---

[7] The dictionary definition of "paid" also supports this construction: "1. To give money in exchange for goods or services.   2. To discharge a debt or obligation." *American Heritage Dictionary of the English Language* (3d ed. 1992).

not on whether it is tangible or has monetary value, but on whether its performance fulfills an obligation."); *In re Nerland Oil, Inc.*, 303 F.3d 911, 920 (8th Cir. 2002) ("To be considered a payment, either money or something of value must be 'given and accepted in partial or full discharge of an obligation.'") (quoting Black's Law Dictionary 1150).[8]

The Arbitrator's construction is also consistent with the use of the term "payment" in § 1679b(b) of CROA:

> (b) Payment in advance.
>
> No credit repair organization may charge or receive any money or other valuable consideration *for the performance of any service which the credit repair organization has agreed to perform* for any consumer before such service is fully performed.

15 U.S.C. § 1679b(b) (emphasis added). As in § 1679a(3)(A), the word "payment" in § 1679b(b) connotes the payment of money *in exchange for* the performance of credit repair services or a *quid pro quo*. "Generally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning.'" *Robers v. United States*, 134 S. Ct. 1854, 1857 (2014) (quoting *Merrill Lynch,*

---

[8] The opposite of a "payment," "quid pro quo," or bargained-for exchange is a "gift" or "donation." A gift is defined as "[t]he voluntary transfer of property to another without compensation." Black's Law Dictionary 595 (10th ed. 2014). A donation is "[a] gift, esp. to a charity." *Id.* at 803. It is well established that "[a] gift . . . does not involve consideration by or on behalf of the donee." *Park Station Ltd. P'ship, LLLP v. Bosse*, 835 A.2d 646, 651 (Md. 2003).

*Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 86 (2006)).     Because "voluntary contributions" were not a *quid pro quo* for the provision of credit repair services, they were not an amount "paid" within the meaning of § 1679g(a)(1) and therefore could not serve as a basis for damages.     Nor could they be "advance payments" for services in violation of § 1679b(b).[9]

Plaintiffs complain that the Arbitrator erred in reading § 1679a(3)(A) and § 1679g(a)(1)(B) together.     Appellants' Brief at 27-29.     However, it is a cardinal rule of statutory construction that "a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).

Plaintiffs also complain that the Arbitrator's finding that "voluntary contributions" were not "payments" or "amounts paid" under § 1679a(3) and § 1679g(a)(1)(B) is "irrevocably inconsistent" with his finding that Defendants were CROs and were "paid for their credit repair services." Appellants' Brief at 7-8, 29.     However, there is no inconsistency in the two findings.     In holding that Defendants were CROs, the Arbitrator concluded that they offered or provided

---

[9] Plaintiffs argue that the Arbitrator held that Defendants violated § 1679b(b) by receiving advance payments for their services before completing those services. Appellants' Brief at 21.     The Court will search in vain for any such holding in the Liability Ruling.     While the Arbitrator did hold that Defendants received "voluntary contributions," he found that those "voluntary contributions" did not constitute "payments."     Thus, he rejected the factual predicate of Plaintiffs' claim under § 1679b(b).

credit repair services in return for the payment of money by someone, not necessarily Class Members. While Defendants were paid for their services, they were paid by Genus and AFS, not by Class Members. In other words, it was not the "voluntary contributions" made by some Class Members to Genus and AFS that rendered Defendants CROs but, rather, the service fees paid by Genus and AFS.

Plaintiffs argue that "voluntary contributions" and "fair share" payments were not, in fact, "voluntary" because the Service Agreements required AFS and Genus to pay a percentage of them to Defendants. Appellants' Brief at 29-30. However, CROA's damages provision relates to amounts paid by aggrieved consumers to the CRO, not amounts paid by third parties (such as AFS and Genus) to the CRO. The Arbitrator correctly concluded that the Class Members' "voluntary contributions" were, in fact, voluntary, and his award "may not be vacated because of disagreement with [his] evaluation of the evidence." *Data & Dev., Inc. v. InfoKall, Inc.*, 513 F. App'x 117, 118 (2d Cir. 2013). *See also Northern New England Tel. Operations LLC v. Local 2327, Int'l Bhd. of Elec. Workers, AFL-CIO,* 735 F.3d 15, 21 (1st Cir. 2013) ("an arbitrator's factual findings are not open to judicial challenge") (citation omitted).

Finally, Plaintiffs argue that, under *CompuCredit Corporation v. Greenwood*, 132 S. Ct. 665 (2012), the Court guaranteed enforcement of CROA's

- 27 -

damages remedy.    Appellants' Brief at 14.    While Plaintiffs are correct that an aggrieved consumer is entitled to damages under CROA, he must first prove his damages, which Plaintiffs failed to do here.  (JA 68-70, ¶¶ 191-8).

Even if the Arbitrator's statutory construction of CROA were incorrect, such legal error would not be grounds to vacate his decision. "[C]onvincing a court of an arbitrator's error – even his grave error – is not enough [to vacate the arbitrator's decision]." *Sutter*, 133 S. Ct. at 2070, 2071.  *See also Schafer v. Multiband Corp.*, 551 F. App'x 814, 815, 820 (6th Cir. 2014) (district court should not have vacated arbitrator's decision, even though it "would doubtless be reversed if it were a court decision . . . because the arbitrator's reading of the relevant section of ERISA is contrary to our precedent"; where arbitrator did not express disagreement with the law but, instead, relied on a broad "plain" reading of the ERISA provision and on precedents the appellate court could distinguish, it was "not enough to show a manifest (as opposed to possible, or even likely) disregard (as opposed to questionable reading) of the law"); *Abbott v. Law Office of Patrick J. Mulligan*, 440 F. App'x 612, 620 (10th Cir. 2011) ("Our role is only to decide whether [the arbitrator] manifestly disregarded the law, something substantially different from a misunderstanding or misapplication of the law.  The panel's possible adoption of a flawed argument is merely error, not manifest disregard of the law, and is not grounds for reversal under the FAA.").

- 28 -

### B. Plaintiffs Failed To Show That The Arbitrator Expressly Ignored Controlling Authority Brought To His Attention That "Voluntary Contributions" Constitute "Payments" or "Amounts Paid" Under CROA

Plaintiffs argue that CROA's damages provision is mandatory, not discretionary, and that the Arbitrator refused to enforce it "to avoid putting [Defendants] out of business." Appellants' Brief at 10, 23, 25, 35-6. The first point is irrelevant, and the second point is without basis.

The Arbitrator did not hold that CROA's damages provision is discretionary. He held that "voluntary contributions" were not "payments" or "amounts paid" and therefore did not fall within the damages provision of § 1679g(a)(1)(B). There is nothing in his ruling remotely suggesting that the Arbitrator declined to award damages because he thought CROA's damages provision was discretionary or because he wanted to avoid putting Defendants out of business.[10]

---

[10] Plaintiffs argue that the Arbitrator's award "was colored by his notions of justice" (Appellants' Brief at 35-36), citing his statement that he did not find "Respondents to be unscrupulous businessmen" and his reluctance to hold that they were CROs. *Id.* However, the fact that the Arbitrator held Defendants to be CROs, despite his reluctance to do so and by following a majority rule he deemed "harsh," only demonstrates that he was scrupulous in following the law notwithstanding his own personal views and sympathies. There is nothing in the record that suggests his decision not to award actual damages under CROA was the result of his sympathy for Defendants, rather than his equally scrupulous statutory construction of CROA. The fact that the Arbitrator considered the financial condition of Defendants in awarding punitive damages (Appellants' Brief at 10 (citing Damages Ruling at JA 83, ¶ 14)) is hardly remarkable, given that a defendant's "net worth" or "ability to pay" is typically considered in determining

Plaintiffs further argue that every court has awarded actual damages for CROA violations. Appellants' Brief at 23-24. However, none of the cases cited by Plaintiffs addressed the question of whether "voluntary contributions" of the sort at issue here constitute "amounts paid" that must be awarded as actual damages under CROA.[11]    Where, as here, the Arbitrator has answered a question of first impression, he cannot, by definition, have manifestly disregarded an

punitive damages. *See Saunders v. B.B. & T. Co. of Va.*, 526 F.3d 142, 154-55 (4th Cir. 2008); *Patterson v. Balsamico*, 440 F.3d 104, 121-22 (2d Cir. 2006).

Like Plaintiffs, Amici argue that the Arbitrator declined to award damages out of concern for Defendants. Amici cite and quote extensively from the transcript, purportedly to show that the Arbitrator expressed concern about making a "disproportionate award." Amicus Brief at 24-6. However, the portions of the transcript from which Amici quote did not involve a discussion of CROA's damages provision. Instead, they concerned Defendants' argument that the Class Determination Award should be altered or amended by decertifying the class under CROA because class treatment is not "superior" where the potential damages are grossly disproportionate to any harm suffered by the Class. DE 29-2.

[11] Elsewhere in their Brief, Plaintiffs cite *Polacsek v. Debticated Consumer Counseling, Inc.*, 413 F. Supp. 2d 539 (D. Md. 2005). Appellants' Brief at 4, 26 n.5, 48. In *Polacsek*, the court held that the CCA in that case could constitute a CRO if the trier of fact determined at trial that the CCA operated *de facto* as a for-profit corporation. *Id.* at 540, 552. In the course of its decision, the court held that the one-time counseling fee and monthly voluntary contributions charged by the CCA were, in fact, payments for services under CROA where the CCA's counselors were instructed to tell consumers that the contributions were payments for services and not tax deductible. *Id.* at 548-49. There was no evidence in *Polacsek* that the CCA provided services to consumers who did not make voluntary contributions or that a large percentage of the CCA's clients did not, in fact, make one or more monthly voluntary contributions, as in the instant case. (JA 55, ¶¶ 119-23). *Polacsek* is in no sense controlling and plainly did not foreclose the Arbitrator from analyzing the definition of "payment" and "amount paid" as he did here.

- 30 -

"applicable legal principle [that] was clearly defined and not subject to reasonable debate." *Bland*, 671 F.3d at 483. *See also Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 216 (2d Cir. 2002) ("if the cases that establish a particular legal principle are factually distinguishable in a material respect from the case at bar, then that principle is not 'well defined, explicit, and clearly applicable'" so as to constitute law that has been manifestly disregarded).

Plaintiffs also argue that the Arbitrator "ignored" the MDMSA which, Plaintiffs contend, prohibits debt management providers from soliciting "voluntary contributions." Appellants' Brief at 37-38. This argument fails for multiple reasons.

First, Plaintiffs did not make this argument before the Arbitrator and therefore waived it. *See Lippert Tile Co. v. Int'l Union of Bricklayers and Applied Craftsmen,* 724 F.3d 939, 945 (7th Cir. 2013). Second, Maryland law is irrelevant to the construction of CROA, a federal statute. Third, the Arbitrator did not ignore the MDMSA: he rejected Plaintiffs' individual claims under that statute because it was enacted *after* Plaintiffs enrolled in their DMPs and because Plaintiffs failed to show the prerequisites for asserting a private cause of action. (JA 74-6, ¶¶ 229-34). Fourth, the MDMSA does not prohibit the solicitation of "voluntary contributions" as Plaintiffs contend; it prohibits debt management providers from *requiring* voluntary contributions and limits the *amount* of voluntary contributions

- 31 -

they may *accept*.  Md. Code Ann., Fin. Inst. § 12-918(f).  In short, the MDMSA has nothing to do with the Arbitrator's decision not to award actual damages under CROA.

In order to meet their heavy burden of showing that the Arbitrator manifestly disregarded the law in failing to award actual damages under CROA, Plaintiffs must establish that the Arbitrator, in making his ruling, was "'aware of the law, understood it correctly, found it applicable to the case before [him], and yet chose to ignore it in propounding [his decision].'" *Amerix Corp. v. Jones*, 457 F. App'x 287, 291 (4th Cir. 2011) (quoting *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 149 (4th Cir. 1994)).  Because Plaintiffs have failed to make that showing, they have failed to establish a basis for vacating the award.  *See Three S. Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 529 (4th Cir. 2007) (movant failed to show that arbitrator manifestly disregarded California law where movant did not "point to any indication in the record where the arbitrator discussed or was presented with the potentially relevant California legal principles" and did not "point to any evidence that the arbitrator expressly chose to ignore such principles").

### C. Plaintiffs Failed To Show That The Arbitrator Expressly Ignored Controlling Authority In Declining To Award Damages Under CROA Based On The Creditors' "Fair Share" Payments, Particularly Where Plaintiffs Represented That They Were Not Seeking Damages Based On "Fair Share" And No Evidence Of Damages Based On "Fair Share" Was Admitted.

Plaintiffs contend that the Arbitrator erred by failing to award the Class "fair share" payments as damages. Appellants' Brief at 31-35. Their assertion is perplexing because Plaintiffs' counsel specifically represented to the Arbitrator that they were not seeking damages based on "fair share" and were limiting their claim for damages to "voluntary contributions." (JA 68, ¶ 191; JA 70, ¶ 198). Consistent with their representations, Plaintiffs did not adduce evidence to support a damages award based on "fair share":

> Even assuming the fair share payments were payments within CROA, however, we have the insurmountable problem of quantifying them debtor by debtor (i.e., calculating the individual class member's fair share). The record lacks a reasonable basis for calculations of how much each consumer might be entitled to receive from Amerix as his or her portion of the fair share payments. . . . Indeed, to attempt that determination would throw us into the quagmire of individualized examinations that would predominate over common issues and destroy the class certification.

(JA 70, ¶ 197).

Plaintiffs argue that the Arbitrator erred in concluding that "fair share," if awarded as damages, would have to be apportioned among individual Class Members. Appellants' Brief at 33-4. However, Plaintiffs' argument ignores

- 33 -

the plain language of § 1679g(a)(1)(B), which confines damages to amounts "paid by the person [aggrieved by the CROA violation] to the [CRO]."

Moreover, even if, *arguendo*, the Arbitrator was wrong in concluding that "fair share" would have to be determined and allocated on a debtor-by-debtor basis and, instead, such payments could have been awarded as damages in an aggregate sum, the only evidence of the aggregate amount of "fair share" was set forth in Defendants' Answer to Interrogatory No. 6 (Appellants' Brief at 32-3), which was admitted for the limited purpose of showing the financial incentives that drove CCAs to enroll consumers in DMPs and <u>not</u> for purposes of proving damages:

> MR. KOPPEL:  It – it – the only – again, the precise numbers [in Defendants' Answer to Interrogatory No. 6] are not important as in [Defendants' Answer to Interrogatory No.] 5 because 5 is the – we do not claim – **let me make it clear, we do not claim that fair-share payments go into the damage calculations.  We're not asking for that.**
>
> THE ARBITRATOR:  Well, what do they prove, part of your case?
>
> MR. KOPPELL:  **They show the financial incentives that drove both Amerix and the CCAs to induce people, if you will, to enter into DMPs because of the huge financial benefits that they've gotten.**  The client –
>
> THE ARBITRATOR:  **If that's the reason, I'll allow it in for that purpose.**  You can show there was an incentive to get fair share.
>
> MR. KOPPEL:  **That's the only reason we want it in.**

- 34 -

MR. GREENWALD: **So it's for a limited purpose.**

THE ARBITRATOR: **Limited purpose**.

(JA 363, line 6 – JA 364, line 4 (emphasis added)).

Finally, a plain reading of § 1679g(a)(1)(B) shows that payments by third parties are not contemplated as damages under CROA. Because "fair share" payments were not "paid by [Class Members]" to the CCAs or Defendants but, instead, were paid by Class Members' *creditors* to the CCAs (JA 56, ¶ 124), they are not encompassed by the plain language of § 1679g(a)(1)(B).

## III. THE ARBITRATOR CORRECTLY EXERCISED HIS DISCRETION AND NEITHER EXCEEDED HIS AUTHORITY NOR MANIFESTLY DISREGARDED THE LAW IN DECLINING TO AWARD CLASS COUNSEL ANY ADDITIONAL ATTORNEYS' FEES AND COSTS.

After losing eight of their nine claims, recovering no compensatory damages, and receiving a punitive damages award equal to less than 1% of their original demand, Class Counsel filed an "excessively broad Application" that included billing records reflecting a total lodestar of $7,579,843.50 in fees and $338,172.48 in costs. (JA 87-8, ¶ 1; JA 104, ¶ 36). These records encompassed every hour Class Counsel had put into the arbitration, including prior and related judicial proceedings, with no reduction for claims that were ultimately unsuccessful.[12] (JA 91-3, ¶ 9, 11; JA 104, ¶ 36). In other words, the application

---

[12] Class Counsel <u>did</u> agree that the lodestar should be reduced by the $2,666,666 in fees and costs they received from the two prior settlements.

3701561.7 19541/092504 01/22/2015

was the same as it would have been if Plaintiffs had prevailed on every claim they asserted from the beginning of the proceedings. (*Id.*).

The Arbitrator concluded that Class Counsel failed to meet their burden of establishing which of the hours and costs in their application were attributable to successful, as opposed to unsuccessful, claims (JA 91-5, ¶¶ 9-15) and failed to meet their burden of establishing that the rates they charged were prevailing market rates in the community for the type of work they performed. (JA 97-103, ¶ 20-23, 32). To make matters worse, Class Counsel's records were replete with "block billing," "questionable entries," "vague, unnecessary, and unreasonable time entries" and unnecessary or extravagant expenses. (JA 100-01, ¶¶ 24-27; JA 102-3, ¶ 32; JA 104-5, ¶ 37). As the Arbitrator explained:

> Counsel knew (or should have known) their time records would need to be submitted should they prevail on a CROA claim. Armed with that knowledge, Class Counsel could and should have maintained better time records. They cannot now use failures in their records regarding the lack of any separation of claims, the use of block billing, the questionable amount of time entries in certain circumstances, the vagueness of certain entries, and more . . . as barriers to my reducing the amounts currently claimed. They did not keep their records in a manner that distinguished the successful from the unsuccessful claims . . . nor do they claim to have done so, relying instead on the position that every hour was intertwined and core and non-distinguishable. Since the records do not allow of precise, or even approximate, calculations, to separate the wheat from the chaff, I do not in this Ruling attempt to make such calculations. All that is feasible is to discuss the claim and record failures

- 36 -

and success, and then apply a general, reasonable rule as to what percentage of the claimed fees and expenses should be allowed.

(JA 100, ¶ 24).

Armed with "a machete rather than a scalpel," the Arbitrator reduced the lodestar by two-thirds, subtracted the amount of attorneys' fees Class Counsel had already received from the settlements with Genus and AFS, and concluded that Class Counsel had already received all the attorneys' fees to which they were entitled. (JA 104, ¶ 36). The Arbitrator reached a similar conclusion with respect to costs. (JA 104-5, ¶ 37).

Class Counsel now seek to evade their own "manifest disregard of the law" by accusing the Arbitrator of having manifestly disregarded the law when he "denied" their application. However, Class Counsel have only themselves to blame for their failure to keep proper billing records or to shoulder their burden of establishing that the fees and costs they claimed were both "reasonable" and attributable to their one "successful" claim.

A district court's award of attorney's fees is reviewed for an abuse of discretion, a "sharply circumscribed" standard of review. *Jackson v. Estelle's Place, LLC*, 391 F. App'x 239, 242 (4th Cir. 2010). "[W]e have recognized that because a district court has close and intimate knowledge of the efforts expended and the value of the services rendered, the fee award must not be overturned unless

- 37 -

it is clearly wrong." *Id.* (citation omitted).  The review of an *arbitrator's* award of attorney's fees is even more circumscribed.  Even if the Arbitrator "misinterpret[ed] [the] law, [engaged] in faulty legal reasoning or [reached an] erroneous legal conclusion," *Upshur Coals Corp. v. UMWA, Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991), such error is not a basis for vacating his decision.

### A.  The Arbitrator Would Have Been Justified In Rejecting Class Counsel's Application In Its Entirety.

While Section 1679g(a)(3) of CROA permits a plaintiff who has brought a "successful" action to recover "reasonable" attorney's fees, CROA leaves the task of defining a "reasonable" fee to the courts.  In recent years, the "lodestar method" has become the favored methodology. *Perdue v. Kenny A.*, 559 U.S. 542, 551 (2010).  The "lodestar method," which is the "starting point" for determining the reasonableness of requested fees, is "the number of hours *reasonably* expended on the litigation multiplied by a *reasonable* hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (emphasis added).  In making this initial calculation, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. . ." *Id.* at 434.

Moreover, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry." *Id.*  Instead, the lodestar must be adjusted further to

eliminate fees incurred in the pursuit of unsuccessful claims unrelated to successful claims. *Id.* at 434-36. As this Court has explained:

> [A]fter calculating the lodestar figure, the court then should subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Once the court has subtracted the fees incurred for unsuccessful, unrelated claims, it then awards some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*Jackson*, 391 F. App'x at 241 (internal quotation marks and citations omitted).

The calculation of a lodestar and the adjustment to the lodestar to account for the plaintiff's degree of success presupposes that the fee applicant has provided the necessary records to make these calculations. If the fee applicant fails to do so, the tribunal has the discretion to reject the request in its entirety:

> The fee applicant … should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims. In addition, the plaintiff may not submit a fee request which is merely an opening bid in the quest for an award. Thus, when the plaintiff prevails on only some claims which are factually and legally distinct from the unsuccessful claims, the plaintiff must make some reasonable effort to weed out the fees incurred on claims it lost at trial....

> Only after the fee applicant complies with his burden must the district court make specific findings as to the appropriate fee award. When the fee application fails to meet these requirements, but instead requests one lump sum so outrageously excessive it shocks the conscience of the court, the district court should, in the proper exercise of its discretion, deny the fee request in its entirety.

*Fair Housing Council v. Landow*, 999 F.2d 92, 97-98 (4th Cir. 1993) (internal punctuation and citations omitted).

Here, Plaintiffs were successful only on one portion of one claim. Moreover, as the Arbitrator noted, the claim on which they prevailed required proof of two facts: that (1) Defendants were CROs and (2) they failed to make the CROA disclosures. (JA 94, ¶ 14). The first fact could have been proven "much more efficiently and briefly" and the second fact "was not contested and virtually no proof was required." (JA 95, ¶ 14).

Despite this stunning lack of success, Class Counsel did precisely what this Court said should not be done when submitting a fee application. (JA 90-1, ¶ 8). Class Counsel started with an "opening bid" of $7,579,843.50, supported by time records that did not allow "a reasonable method to separate time spent on common issues from time spent on successful as compared to unsuccessful claims." (JA 95, ¶ 15). Class Counsel sought recompense for "every hour put in to this arbitration . . . even though [Plaintiffs] did not prevail on most of the claims, even though the amount obtained for the class was far below what Class Counsel sought, and even though the Application contained no indication of 'billing judgment' having been applied." (JA 91-2, ¶ 9). Class Counsel recognized many of these deficiencies (JA 91-3, ¶¶ 9, 11) but, when given the opportunity to "readjust" their application, limited their response to an across-the-

- 40 -

board 5% reduction, which the Arbitrator characterized as "drawn out of the air" and "little more than a vague acknowledgment that the Application, as submitted, was defective." (JA 101, ¶ 28).

Although the Arbitrator would have been justified in disallowing the application in its entirety, he carefully reviewed the hours and rates, considered the extent of Plaintiffs' success, and reduced the lodestar accordingly. (JA 92, ¶ 10).

**B.    The Arbitrator Reduced The Lodestar Amount Because Class Counsel Failed To Satisfy Their Burden Of Demonstrating That The Requested Rates And The Hours Expended Were Reasonable.**

Plaintiffs argue that the Arbitrator's decision to reduce the lodestar by two-thirds was "substantially premised on his decision to deny the Class actual damages under CROA." Appellants' Brief at 39. However, the two-thirds reduction was the result of the "numerous ways" in which Class Counsel "fail[ed] to meet the required legal and/or factual standards" for proving that their requested rates and hours were reasonable. (JA 104, ¶ 36). In particular, the Arbitrator found:

- Plaintiff failed "to establish the 'prevailing market rates' in the community for the type of work for which they seek an Award" which, under *Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987), was their burden. (JA 97-9, ¶¶ 20-21).

- Plaintiffs failed to show "that capable local community counsel were unavailable in Maryland, as was their burden" to justify their excessive New York hourly rates. (JA 99-100, ¶ 23; JA 102-3, ¶ 32).

- 41 -

- Plaintiffs failed to maintain proper time records "regarding the lack of any separation of claims, the use of block billing, the questionable amount of time entries in certain circumstances, the vagueness of certain entries, and more . . . ." (JA 100, ¶ 24).

- Plaintiffs failed to "record[] their time in a manner that allowed some measure of segregation of the successful claims from the non-successful ones" which "under *Fair Housing Council*, [999 F.2d at 97] . . . was their burden." (JA 93, ¶ 12).

These findings do not represent a manifest disregard of the law by the Arbitrator. They represent a complete failure by Class Counsel to sustain their burden of proof.

### 1. Plaintiffs Failed To Prove That Class Counsel's Requested Hourly Rates Were Consistent With The "Prevailing Market Rates" in Maryland.

As the Court explained in *Hensley v. Eckerhart*, the "most useful starting point for determining the amount of a reasonable fee is the number of hours *reasonably expended* multiplied by a *reasonable hourly rate*." 461 U.S. at 433 (emphasis added). The reasonable hourly rate is generally the prevailing market rate for comparable services in the community in which the services were rendered. *Rum Creek Coal Sales v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994). "[T]he burden is on the fee applicant to produce satisfactory evidence – in addition to the attorney's own affidavits – that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n. 11 (1984).

- 42 -

Plaintiffs tried to satisfy their burden by "submitting several Declarations of counsel who were seeking or were awarded fees for successes involving federal statutes." (JA 98-9, ¶ 21). The Arbitrator rejected these declarations as "erroneous," "inconsistent," and irrelevant. (*Id.*). He then compared Class Counsel's requested rates with those in the district court's Rules and Guidelines for Determining Attorneys' Fees in Certain Cases ("Maryland Guidelines") and determined that "the lodestar rates proposed by Class Counsel need[ed] to be adjusted downwards." (JA 98-100, ¶¶ 21-3).

In the absence of any other evidence establishing the prevailing market rates for Class Counsel's services, the Arbitrator properly exercised his discretion and reduced the requested rates to be consistent with those in the Maryland Guidelines. *See CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000) (affidavits of other counsel are the preferred evidence of the prevailing market rates for legal services but "in the absence of sufficient documentation, the court may rely on its own knowledge of the market"); *Norman v. Housing Auth.*, 836 F.2d 1292, 1303 (11th Cir. 1988) ("The court . . . . may consider its own knowledge and experience . . . and may form an independent judgment either with or without the aid of witnesses as to value.") (internal quotation marks and citations omitted)).

- 43 -

3701561.7 19541/092504 01/22/2015

##### 2. Plaintiffs Failed To Prove That The Number Of Hours Expended In The Underlying Arbitration Was Reasonable.

The Arbitrator also reviewed the number of hours expended by Class Counsel. The fee applicant bears the burden of documenting and supporting the number of hours expended in the litigation and must produce "an itemized listing of hours and expenses and a short description for each entry explaining how the time was spent." *Thompson v. U.S. Dept. of Hous. & Urban Dev.*, No. Civ. A. MGJ-95-309, 2002 WL 31777631, at *9 (D. Md. Nov. 21, 2002). When reviewing the billing records, the Arbitrator must ensure that Class Counsel exercised "billing judgment." *CoStar Group*, 106 F. Supp. 2d at 789 (citing *Hensley*, 461 U.S. at 434). Billing judgment is "the usual practice of law firms in writing off unproductive, excessive, or redundant hours." *Walker v. U.S. Dept. of Housing and Urb. Dev.*, 99 F.3d 761, 769 (5th Cir. 1996). Billing judgment is typically reflected in the fee application, showing not only hours claimed but also hours written off. *Leroy v. City of Houston*, 831 F.2d 576, 585 & n.15 (5th Cir. 1987).

The Arbitrator found that Class Counsel's application "contained no indication of 'billing judgment' having been applied" and, instead, sought "recompense for every hour put in to this arbitration..." (JA 91-2, ¶ 9). He also found merit to Defendants' argument that the billing records contained time entries that were "excessive, vague, unnecessary and unreasonable." (JA 101, ¶ 25). He disapproved of Class Counsel's use of block billing and questioned the

- 44 -

reasonableness of certain expenses, particularly those from costly restaurants.  (JA 101, ¶¶ 26-27).  He also found that Class Counsel, as "highly experienced class action attorneys," should have maintained better time records, and because they "fail[ed] to maintain proper records," he was unable to calculate a reasonable fee by multiplying the reduced and now reasonable hourly rates by the hours reasonably expended.  (JA 94-5, ¶¶ 14 n.4; JA 100-01, ¶¶ 24, 26).

The Arbitrator ran into the same problem when he tried to "subtract fees for hours spent on unsuccessful claims unrelated to successful ones." *Johnson v. City of Aiken*, 278 F.3d 33, 337 (4th Cir. 2002).  He correctly recognized that "[w]hen a plaintiff prevails in only one of several claims and that claim is unrelated to unsuccessful claims, the plaintiff has the burden of showing which hours are recoverable for the successful claim." (JA 92, ¶ 11) (citing *Fair Housing Council*, 999 F.2d at 97).  However, Class Counsel refused to make any effort to do so, insisting, instead, that every hour they recorded over the course of nine years was "inextricably intertwined" with their sole successful claim. (JA 92-5, ¶¶ 11-5; JA 100, ¶ 24).  The Arbitrator concluded that Class Counsel could have "recorded their time in a manner that allowed some measure of segregation of the successful claims from the non-successful ones" and it "would neither be fair to [Defendants] nor reasonable to allow Class Counsel to benefit from their" failure to do so. (JA 93, ¶ 12).

3701561.7 19541/092504 01/22/2015

In the end, "Class Counsel['s] . . . failures to maintain and present records that adequately establish[ed] the basis for their claim" (JA 93, ¶ 12), coupled with their failure to make any effort, let alone "a good faith effort[,] to exclude from [their] fee request hours that [were] excessive, redundant, or otherwise unnecessary" (*Hensley*, 461 U.S. at 434), prevented the Arbitrator from making precise or even approximate calculations as to the hours reasonably expended "in the prosecution of a 'successful action to enforce any liability' under CROA." (JA, 96-7, ¶ 18; JA100, ¶ 24). Instead, the Arbitrator was limited to discussing "the claim and record failures and success" and then applying "a general, reasonable rule as to what percentage of the claimed fees and expenses should be allowed." (JA 100, ¶ 24). In doing so, the Arbitrator exercised his discretion and determined "that a fair and equitable result was to reduce the total lodestar by two-thirds. (JA 104, ¶ 36).

### 3. The Arbitrator Did Not Double Count The Fees Awarded To Class Counsel In Connection With Prior Settlements.

The Arbitrator correctly recognized that Class Counsel included in their fee application billing records reflecting time entries for every minute of every hour they expended on the arbitration. (JA 91-2, ¶ 9). The Arbitrator calculated this amount to be $7,579,843.50, representing the $7,484,628 in

attorneys' fees[13] sought in Class Counsel's initial application, plus $95,215.50 in fees incurred in preparing and presenting the application.  (JA 87-8, ¶ 1).  Class Counsel also sought expenses totaling $338,172.48.  (*Id.*).

Starting with the total lodestar of $7,579,843.50, the Arbitrator first subtracted $75,612.50 based on Class Counsel's withdrawal of their claim for Jack Sando's fees (JA 87-8, ¶ 1), bringing the net amount of fees to $7,504,231, with expenses at $338,172.48.  The Arbitrator then reduced both the fees and expenses by two-thirds because of the "numerous ways" in which Class Counsel "fail[ed] to meet the required legal and/or factual standards," and found that attorneys' fees of $2,501,410 and expenses of $112,724.16 were reasonable.  (JA 104-5, ¶¶ 36-37).  The Arbitrator then offset against these amounts the $2,666,666 in fees awarded in the two prior settlements (JA 87-8, ¶ 1) and ruled that, because those "prior awards [totaling $2,666,666] exceed this Award [$2,501,410 in fees + $112,724.16 in expenses = $2,614,134.16], no further payment of attorneys' fees is required" and "the claim for reimbursements [of expenses] is satisfied."  (JA 104-5, ¶¶ 36-37).

In arriving at this conclusion, the Arbitrator did not "double count" fees previously awarded to Class Counsel or "twice reduce" Class Counsel's application by the amount of those fees, as Plaintiffs argue.  Appellants' Brief at 50.  To the contrary, he subtracted the $2,666,666 awarded in the prior settlements

---

[13] This amount included the $2,666,666 Class Counsel had already received in connection with the Genus and AFS settlements.

- 47 -

only once and, having done so, correctly concluded that Class Counsel had already received all the fees and costs they deserved.

Plaintiffs have failed to cite any authority – much less controlling authority that was brought to the Arbitrator's attention and ignored – which prohibited the Arbitrator from calculating the attorneys' fees and costs as he did. Indeed, a federal court in New York recently applied a similar approach in awarding fees in an antitrust class action.

In *In re Vitamin C Antitrust Litigation*, Nos. 06-MD-1738 (BMC) (JO), 05-C-453, 2013 WL 6858853 (E.D. N.Y. Dec. 30, 2013), the plaintiffs obtained a jury award of $54 million, which was trebled under the Clayton Act. Before trial, several of the defendants settled with the plaintiffs and, as a result of the amounts paid under these settlements, the judgment against the non-settling defendants ($162.3 million) was reduced by $9 million to take into account the settling defendants' contribution. The plaintiffs then submitted an application for attorneys' fees of $13.7 million and costs of $1.3 million. *Id.* at *1. These amounts included all fees and costs incurred in the course of the seven year litigation, without any reduction for fees and costs class counsel had previously received in connection with the prior settlements. *Id.* at *6.

Like the Arbitrator here, the court first considered the rates charged and the hours expended by the plaintiffs' counsel, taking into consideration the

defendants' objections relating to efficiency, record keeping, travel time, block billing, and partner hours (*i.e.*, high-rate partners doing work more appropriately performed by lower-rate associates). *Id.* at **2-4. The court analyzed each objection and then deducted $25,993 for block billing entries that included travel time and $30,485 for high-rate partners performing work that should have been performed by less expensive lawyers. *Id.* at **4-5. The court did not make any reductions for inefficiencies and inadequate record-keeping because class counsel voluntarily reduced their fee request by $330,000 to address these issues, a reduction the court found adequate. *Id.* at *4.

After reducing the original lodestar to $13,668,163.35 for these deficiencies, the court then applied an offset against this amount to take into consideration the $9,575,000 in fees that class counsel had already received from settlements with other defendants and ultimately awarded fees of $4,093.163.35 ($13,668,163.35 − $9,575,000.00 = $4,093,163.35). *Id.* at *6. The court recognized that "[f]ailing to apply an offset amounts to a windfall, and allowing 'an attorney to receive a windfall would be manifestly unreasonable.'" *Id.* (quoting *Corder v. Brown*, 25 F.3d 833, 839 (9th Cir. 1992)). The court denied the plaintiffs' request for costs because the plaintiffs failed to sustain their burden of proof. In short, the court followed the same methodology used by the Arbitrator here.

- 49 -

Plaintiffs argue that the Arbitrator improperly relied on *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 789 F. Supp. 1288 (D. N.J. 1992), which was vacated by the Third Circuit in 995 F.2d 414 (3d Cir. 1993). Appellants' Brief at 51-5. Plaintiffs are wrong.

Citing the district court's decision, the Arbitrator correctly recognized that the amounts Plaintiffs received in the two prior settlements were not relevant in determining the degree of success obtained by Plaintiffs against Amerix and Mr. Dancel, as argued by Class Counsel. (JA 103, ¶ 34). In vacating the district court's decision in *Gulfstream III*, the Third Circuit did not address, much less reject, this proposition.

The two points on which the Third Circuit reversed the district court are not relevant here. First, the Third Circuit held that the district court erred in holding that there was a blanket legal impediment to the plaintiff recovering attorneys' fees and expenses it had incurred in the related *Falcon Jet* lawsuit from the defendant in the *Gulfstream* lawsuit where much of the work done in the *Falcon Jet* lawsuit was used in the *Gulfstream* lawsuit. 995 F.2d at 420. Second, the Third Circuit found that the district court erred in finding that the plaintiff attained only limited success because the jury verdict of $2,992,500 was reduced to $0 by the amounts the plaintiff received from settling defendants. 995 F.2d at 423-24. Neither of these points addresses the propriety of the Arbitrator's actions in

- 50 -

reducing the lodestar by two-thirds to account for the numerous problems with Class Counsel's fee application or subtracting the fees Class Counsel received from the prior settlements.

### C. The Arbitrator Did Not Manifestly Disregard The Law By Distinguishing *Perdue*.

Plaintiffs argue that the Arbitrator refused to follow *Perdue v. Kenny A.*, 559 U.S. 542 (2010). Appellants' Brief at 40-2. According to Plaintiffs, *Perdue* holds that the lodestar amount is presumptively correct and can only be adjusted downward in "rare" and "exceptional circumstances." *Id.* at 41. Plaintiffs misconstrue both the Arbitrator's ruling and *Perdue*.

The Arbitrator did not refuse to follow *Perdue*. He acknowledged that, under *Perdue*, the lodestar is entitled to a "presumption of correctness" but noted that this presumption can be "rebut[ed]," as it was in this case. (JA 97, ¶ 19). The Arbitrator rejected Plaintiffs' argument that *Perdue* prohibits a tribunal from reducing a lodestar absent "rare" or "exceptional" circumstances in favor of a plain reading of *Perdue*. As the Arbitrator recognized, *Perdue* "did not involve reduction of a lodestar but concerned limited discretion in *increasing* a lodestar." (JA 97, ¶ 20).

The Arbitrator's ruling is in keeping with this Circuit's precedents. *See McAfee v. Boczar*, 738 F.3d 81, 90 (4th Cir. 2013) (recognizing that *Perdue* applies only to the enhancement of a lodestar attorney's fee). In fact, four months

- 51 -

after *Perdue* was decided, this Court rejected virtually the same argument advanced by Plaintiffs here. *Jackson v. Estelle's Place, LLC*, 391 F. App'x. 239, 244 (4th Cir. 2010).[14]

In short, the Arbitrator did not find *Perdue* "applicable to the case before [him]" and yet choose "to ignore it in propounding [his] decision.'" *Amerix Corp.*, 457 F. App'x at 294 (quoting *Remmey*, 32 F.3d at 149). Instead, the Arbitrator interpreted *Perdue* and found it to be distinguishable. Applying and distinguishing the law is not manifestly disregarding it. *See, e.g., Parsons Energy & Chem. Group, Inc. v. Williams Union Boiler,* 128 F. App'x 920, 926 (3d Cir. 2005) (rejecting argument that arbitrators manifestly disregarded a leading Delaware case when they awarded attorneys' fees: "At worst, the arbitrators wrongly applied *Hubbard*, but they did not manifestly disregard it."); *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1112 (9th Cir. 2004) ("Luong's complaint is that the arbitrator extended the ruling of *Toyota*, and thus disregarded it. However, without expressing a view one way or the other on whether the arbitrator got *Toyota* right, it is clear that the arbitrator did not *ignore* it. . . . Virtually every

---

[14] Ignoring this Court's decisions in *McAfee* and *Jackson*, Plaintiffs rely on *Bywaters v. United States*, 670 F.3d 1221 (Fed. Cir. 2012) for the proposition that the lodestar may be adjusted downward only in "rare" and "exceptional" circumstances. Appellants' Brief at 41. Not only is *Bywaters* contrary to controlling Fourth Circuit authority, but no Maryland court has ever cited *Bywaters* with approval, and no court anywhere has cited *Bywaters* for the proposition for which Plaintiffs offer it.

- 52 -

line of the opinion and award discusses *Toyota* and how it plays out on the facts in Luong's case. That cannot amount to 'manifest disregard of federal law.'").

### D. The Arbitrator Did Not Manifestly Disregard The Law In His Application Of The *Johnson* Guidelines.

Plaintiffs contend that the Arbitrator refused to follow the twelve-factor test of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), adopted by this Court in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978). Appellants' Brief at 42-9. Plaintiffs' argument is without merit. Because the Arbitrator first determined the reasonable hourly rate for the services provided and then determined the hours reasonably expended on the successful claim, many of the *Johnson* factors were implicitly incorporated into his analysis. *Hensley*, 461 U.S. at 434 n.9 (many of the *Johnson* factors may be duplicative if the court first determines the hours expended and a reasonable hourly rate for the services). As one court explained:

> The reasonableness of the rate implicates, it seems, Factor 3 (the skill required to properly perform the legal services rendered); Factor 5 (the customary fee); Factor 6 (the attorney's expectation at the outset of the litigation, i.e., whether the fee is fixed or contingent); Factor 9 (the experience, reputation and ability of the attorney); and Factor 4 (the attorney's opportunity cost in pressing the instant litigation). In one way or another, those factors play a role in the determination of a reasonable hourly rate, just as they do in a law firm's rate setting process.
>
> The assessment of the number of hours reasonably expended implicates Factor 1 (the time and labor expended); Factor 2 (the novelty and difficulty of the

- 53 -

questions raised); and Factor 7 (the time limitations imposed by the client or the circumstances). Each of those factors rather obviously bears on the time that reasonably should be devoted to a case.

That leaves four *Johnson* factors: Factor 8 (the amount in controversy and the results obtained); Factor 10 (the undesirability of the case within the legal community within which the case arose); Factor 11 (the nature and length of the professional relationship between the attorney and the client); and Factor 12 (attorneys' fees awards in similar cases).

*McAfee v. Boczar*, 906 F. Supp. 2d 484, 492 (E.D. Va. 2012) (internal citation omitted), v*acated and remanded on other grounds*, 738 F.3d 81 (4th Cir. 2013).

Here, the Arbitrator first analyzed the reasonableness of Class Counsel's requested rates and then attempted to assess the number of hours reasonably expended. (JA 97-103, ¶¶ 20-23 & 24-32). In doing so, he necessarily applied eight of the twelve *Johnson* factors. *McAfee*, 906 F. Supp. 2d at 492. He also spent considerable time discussing factor 8 – "the amount in controversy and results obtained" (JA 91, ¶ 9; 94-5, ¶ 14) – which is "the most critical" factor in calculating an award. *McDonnell v. Miller Oil Co.*, 134 F.3d 638, 641 (4th Cir. 1998) (*citing Hensley*, 461 U.S. at 436). The fact that the Arbitrator did not specifically allude to factors 10 through 12 is immaterial, as the *Johnson* factors are intended to be "guidelines." *Johnson*, 488 F.2d at 717, 719, 720 (referring to

factors as "guidelines").[15]    *See also Von Clark v. Butler*, 916 F.2d 255, 260 (5th Cir. 1990) (affirming attorneys' fees award where district court "either implicitly or explicitly addressed each of the Johnson factors").

Plaintiffs' argument that the Arbitrator erred by considering factors in addition to those in *Johnson* (Appellants' Brief at 44) is similarly flawed, as the *Johnson* factors are not exclusive. *See also Hughes v. Repko*, 578 F.2d 483, 492 n.6 (3d Cir. 1978) (the "twelve factors enumerated in *Johnson*, of course, are not exclusive"); *McDow v. Rosado*, 657 F. Supp. 2d 463, 467 (S.D.N.Y. 2009) ("[t]he *Johnson* factors, among others, apply with varying force on a non-exclusive basis"). This approach makes perfect sense, considering that an award of legal fees is a fact-specific inquiry that relies heavily on the tribunal's exercise of discretion.

## IV. PLAINTIFFS FAILED TO SHOW THAT THE DISTRICT COURT ERRED IN RULING THAT THE ARBITRATOR'S DECISIONS WERE "THOUGHTFUL AND WELL CONSIDERED"

Plaintiffs complain that the district court's review of the Arbitrator's rulings was "cursory" and that the court's memorandum opinion was too short and lacked findings of fact and conclusions of law. Appellants' Brief at 59-60. Plaintiffs' complaint is of no import since this Court reviews the district court's

---

[15] Plaintiffs cite a number of decisions where this Court reversed a district court's award of attorneys' fees because the court did not apply the *Johnson* factors. *See* Appellants' Brief at 43-4. Plaintiffs fail to appreciate the markedly different standard of review applicable to district courts' awards of attorney's fees (abuse of discretion) and arbitral awards.

ruling *de novo*.   Apart from their complaint as to the length and form of the court's decision, Plaintiffs have offered nothing to contest the court's conclusion that the Arbitrator's rulings were "thoughtful and well-considered."  (JA 436).

## **CONCLUSION**

For the foregoing reasons, Defendants ask the Court to affirm the district court's decision.

Dated:  January 23, 2015                    Respectfully submitted,

/s/ Brian L. Moffet
Lawrence S. Greenwald
Catherine A. Bledsoe
Brian L. Moffet
Gordon Feinblatt LLC
233 East Redwood St.
Baltimore, MD 21202-3332
Tel.  (410) 576-4264
Fax. (410) 576-4269
Email: lgreenwald@gfrlaw.com
Email: cbledsoe@gfrlaw.com
Email: bmoffet@gfrlaw.com
**Attorneys for Defendants Amerix Corporation, 3C Incorporated, Bernaldo Dancel, AscendOne Corporation, and CareOne Services, Inc.**

3701561.7 19541/092504 01/22/2015

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief has been prepared using:

        Fourteen point, proportionally spaced, serif typeface Times New Roman, Word, 14 point.

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules or regulations; and the certificate of service, the brief contains:

     <u>13,989</u>  Words

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief and/or copy of the word or line print-out

<u>1/23/15</u>                      <u>/s/ Brian L. Moffet</u>
Date                            Brian L. Moffet

3701561.7 19541/092504 01/22/2015

# ADDENDUM

# **ADDENDUM**

15 U.S.C. § 1679a ...........................................................................Appx 1

15 U.S.C. § 1679b ...........................................................................Appx 3

15 U.S.C. § 1679c ...........................................................................Appx 7

15 U.S.C. § 1679d .........................................................................Appx 11

15 U.S.C. § 1679e .........................................................................Appx 14

15 U.S.C. § 1679g .........................................................................Appx 17

Westlaw.

▷

**Effective: September 30, 1996**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    ▣ Chapter 41. Consumer Credit Protection (Refs & Annos)
      ▣ Subchapter II-A. Credit Repair Organizations
       →→ **§ 1679a. Definitions**

For purposes of this subchapter, the following definitions apply:

  (1) Consumer

The term "consumer" means an individual.

  (2) Consumer credit transaction

The term "consumer credit transaction" means any transaction in which credit is offered or extended to an individual for personal, family, or household purposes.

  (3) Credit repair organization

The term "credit repair organization"--

  **(A)** means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

valuable consideration, for the express or implied purpose of--

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

(B) does not include--

(i) any nonprofit organization which is exempt from taxation under section 501(c)(3) of Title 26;

(ii) any creditor (as defined in section 1602 of this title), with respect to any consumer, to the extent the creditor is assisting the consumer to restructure any debt owed by the consumer to the creditor; or

(iii) any depository institution (as that term is defined in section 1813 of Title 12) or any Federal or State credit union (as those terms are defined in section 1752 of Title 12), or any affiliate or subsidiary of such a depository institution or credit union.

(4) Credit

The term "credit" has the meaning given to such term in section 1602(e) of this title.

CREDIT(S)

(Pub.L. 90-321, Title IV, § 403, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-455.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## HISTORICAL AND STATUTORY NOTES

### Revision Notes and Legislative Reports

1968 Acts. House Report No. 1040 and Conference Report No. 1397, see 1968 U.S. Code Cong. and Adm. News, p. 1962.

### References in Text

Section 1602(e) of this title, referred to in par. (4), was redesignated section 1602(f) of this title by Pub.L. 111-203, Title X, § 1100A(1)(A), July 21, 2010, 124 Stat. 2107.

### Effective and Applicability Provisions

1996 Acts. Section applicable after end of 6-month period beginning on Sept. 30, 1996, except with respect to contracts entered into by credit repair organization before end of such period, see section 413 of Pub.L. 90-321, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-455, set out as a note under section 1679 of this title.

### Prior Provisions

For a prior section 403 of Pub.L. 90-321, see note set out under section 1679 of this title.

### LIBRARY REFERENCES

Corpus Juris Secundum

   CJS Bankruptcy § 334, Temporary Waiver.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

15 U.S.C.A. § 1679b                                                                        Page 1

c

**Effective: September 30, 1996**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 41. Consumer Credit Protection (Refs & Annos)
      Subchapter II-A. Credit Repair Organizations
      →→ **§ 1679b. Prohibited practices**

(a) In general

No person may--

  **(1)** make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to--

    **(A)** any consumer reporting agency (as defined in section 1681a(f) of this title); or

    **(B)** any person--

      **(i)** who has extended credit to the consumer; or

      **(ii)** to whom the consumer has applied or is applying for an extension of credit;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(2)** make any statement, or counsel or advise any consumer to make any statement, the intended effect of which is to alter the consumer's identification to prevent the display of the consumer's credit record, history, or rating for the purpose of concealing adverse information that is accurate and not obsolete to--

  **(A)** any consumer reporting agency;

  **(B)** any person--

    **(i)** who has extended credit to the consumer; or

    **(ii)** to whom the consumer has applied or is applying for an extension of credit;

**(3)** make or use any untrue or misleading representation of the services of the credit repair organization; or

**(4)** engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

(b) Payment in advance

No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

CREDIT(S)

(Pub.L. 90-321, Title IV, § 404, as added Pub.L. 104-208, Div. A, Title II, § 2451,

Sept. 30, 1996, 110 Stat. 3009-456.)

## HISTORICAL AND STATUTORY NOTES

### Revision Notes and Legislative Reports

1968 Acts. House Report No. 1040 and Conference Report No. 1397, see 1968 U.S. Code Cong. and Adm. News, p. 1962.

### Effective and Applicability Provisions

1996 Acts. Section applicable after end of 6-month period beginning on Sept. 30, 1996, except with respect to contracts entered into by credit repair organization before end of such period, see section 413 of Pub.L. 90-321, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-456, set out as a note under section 1679 of this title.

### Prior Provisions

For a prior section 404 of Pub.L. 90-321, see note set out under 15 U.S.C.A. § 1679.

## LIBRARY REFERENCES

American Digest System

 Antitrust and Trade Regulation ☞218.

 Key Number System Topic No. 29T.

Corpus Juris Secundum

 CJS Credit Reporting Agencies; Consumer Protection § 4, Nature and Purpose of the Fair

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

15 U.S.C.A. § 1679c                                                   Page 1

c

**Effective: September 30, 1996**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 41. Consumer Credit Protection (Refs & Annos)
     Subchapter II-A. Credit Repair Organizations
      →→ **§ 1679c. Disclosures**

(a) Disclosure required

Any credit repair organization shall provide any consumer with the following
written statement before any contract or agreement between the consumer and the
credit repair organization is executed:

**"Consumer Credit File Rights Under State and Federal Law**

"You have a right to dispute inaccurate information in your credit report by con-
tacting the credit bureau directly. However, neither you nor any 'credit repair'
company or credit repair organization has the right to have accurate, current, and
verifiable information removed from your credit report. The credit bureau must
remove accurate, negative information from your report only if it is over 7 years old.
Bankruptcy information can be reported for 10 years.

"You have a right to obtain a copy of your credit report from a credit bureau. You
may be charged a reasonable fee. There is no fee, however, if you have been turned
down for credit, employment, insurance, or a rental dwelling because of information

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

"You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

"You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

"Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

"You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

"If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

"The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"The Public Reference Branch

"Federal Trade Commission

"Washington, D.C. 20580".

(b) Separate statement requirement

The written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer.

(c) Retention of compliance records

  (1) In general

  The credit repair organization shall maintain a copy of the statement signed by the consumer acknowledging receipt of the statement.

  (2) Maintenance for 2 years

  The copy of any consumer's statement shall be maintained in the organization's files for 2 years after the date on which the statement is signed by the consumer.

CREDIT(S)

(Pub.L. 90-321, Title IV, § 405, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-457.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1968 Acts. House Report No. 1040 and Conference Report No. 1397, see 1968 U.S. Code Cong. and Adm. News, p. 1962.

References in Text

The Credit Repair Organization Act, referred to in the disclosure statement set out in subsec. (a), was probably meant as a reference to the Credit Repair Organizations Act, Pub.L. 90-321, Title IV, as added, which is classified to this subchapter. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

Effective and Applicability Provisions

1996 Acts. Section applicable after end of 6-month period beginning on Sept. 30, 1996, except with respect to contracts entered into by credit repair organization before end of such period, see section 413 of Pub.L. 90-321, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-457, set out as a note under section 1679 of this title.

Prior Provisions

For a prior section 405 of Pub.L. 90-321, see note set out under 15 U.S.C.A. § 1679.

LIBRARY REFERENCES

American Digest System

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

C

**Effective: September 30, 1996**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 41. Consumer Credit Protection (Refs & Annos)
    Subchapter II-A. Credit Repair Organizations
      **→→ § 1679d. Credit repair organizations contracts**

(a) Written contracts required

No services may be provided by any credit repair organization for any consumer--

  **(1)** unless a written and dated contract (for the purchase of such services) which meets the requirements of subsection (b) of this section has been signed by the consumer; or

  **(2)** before the end of the 3-business-day period beginning on the date the contract is signed.

(b) Terms and conditions of contract

No contract referred to in subsection (a) of this section meets the requirements of this subsection unless such contract includes (in writing)--

  **(1)** the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

person;

**(2)** a full and detailed description of the services to be performed by the credit repair organization for the consumer, including--

  **(A)** all guarantees of performance; and

  **(B)** an estimate of--

    **(i)** the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete; or

    **(ii)** the length of the period necessary to perform such services;

  **(3)** the credit repair organization's name and principal business address; and

  **(4)** a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.".

CREDIT(S)

(Pub.L. 90-321, Title IV, § 406, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-458.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Appeal: 14-2160     Doc: 46     Filed: 01/23/2015     Pg: 96 of 103

1968 Acts. House Report No. 1040 and Conference Report No. 1397, see 1968 U.S. Code Cong. and Adm. News, p. 1962.

Effective and Applicability Provisions

1996 Acts. Section applicable after end of 6-month period beginning on Sept. 30, 1996, except with respect to contracts entered into by credit repair organization before end of such period, see section 413 of Pub.L. 90-321, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-458, set out as a note under section 1679 of this title.

Prior Provisions

For a prior section 406 of Pub.L. 90-321, see note set out under 15 U.S.C.A. § 1679.

LIBRARY REFERENCES

American Digest System

    Antitrust and Trade Regulation ☜218.
    Key Number System Topic No. 29T.

RESEARCH REFERENCES

ALR Library

40 ALR, Fed. 2nd Series 391, Validity, Construction, and Application of Credit Repair Organizations Act, 15 U.S.C.A. §§ 1679 et Seq.

Encyclopedias

111 Am. Jur. Proof of Facts 3d 205, Proof of Claim Involving Violation of Credit Repair Organizations Act, 15 U.S.C.A. §§ 1679 et Seq., or Similar State Enactment.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

15 U.S.C.A. § 1679e                                            Page 1

c

**Effective: September 30, 1996**

United States Code Annotated Currentness
   Title 15. Commerce and Trade
      Chapter 41. Consumer Credit Protection (Refs & Annos)
        Subchapter II-A. Credit Repair Organizations
         →→ **§ 1679e. Right to cancel contract**

(a) In general

Any consumer may cancel any contract with any credit repair organization without
penalty or obligation by notifying the credit repair organization of the consumer's
intention to do so at any time before midnight of the 3rd business day which begins
after the date on which the contract or agreement between the consumer and the
credit repair organization is executed or would, but for this subsection, become
enforceable against the parties.

(b) Cancellation form and other information

Each contract shall be accompanied by a form, in duplicate, which has the heading
"Notice of Cancellation" and contains in bold face type the following statement:

  "You may cancel this contract, without any penalty or obligation, at any time be-
  fore midnight of the 3rd day which begins after the date the contract is signed by
  you.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

"To cancel this contract, mail or deliver a signed, dated copy of this cancellation notice, or any other written notice to [name of credit repair organization] at [address of credit repair organization] before midnight on [date]

"I hereby cancel this transaction,

[date]

[purchaser's signature].".

(c) Consumer copy of contract required

Any consumer who enters into any contract with any credit repair organization shall be given, by the organization--

(1) a copy of the completed contract and the disclosure statement required under section 1679c of this title; and

(2) a copy of any other document the credit repair organization requires the consumer to sign,

at the time the contract or the other document is signed.

CREDIT(S)

(Pub.L. 90-321, Title IV, § 407, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-459.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1968 Acts. House Report No. 1040 and Conference Report No. 1397, see 1968 U.S. Code Cong. and Adm. News, p. 1962.

Effective and Applicability Provisions

1996 Acts. Section applicable after end of 6-month period beginning on Sept. 30, 1996, except with respect to contracts entered into by credit repair organization before end of such period, see section 413 of Pub.L. 90-321, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-459, set out as a note under section 1679 of this title.

Prior Provisions

For a prior section 407 of Pub.L. 90-321, see note set out under 15 U.S.C.A. § 1679.

LIBRARY REFERENCES

American Digest System

   Antitrust and Trade Regulation ☞218.
   Key Number System Topic No. 29T.

RESEARCH REFERENCES

ALR Library

40 ALR, Fed. 2nd Series 391, Validity, Construction, and Application of Credit Repair Organizations Act, 15 U.S.C.A. §§ 1679 et Seq.

Encyclopedias

111 Am. Jur. Proof of Facts 3d 205, Proof of Claim Involving Violation of Credit Repair Organizations Act, 15 U.S.C.A. §§ 1679 et Seq., or Similar State Enactment.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

15 U.S.C.A. § 1679g                                                            Page 1

c

**Effective: September 30, 1996**

United States Code Annotated Currentness
    Title 15. Commerce and Trade
        Chapter 41. Consumer Credit Protection (Refs & Annos)
            Subchapter II-A. Credit Repair Organizations
            ➝➝ **§ 1679g. Civil liability**

(a) Liability established

Any person who fails to comply with any provision of this subchapter with respect to
any other person shall be liable to such person in an amount equal to the sum of the
amounts determined under each of the following paragraphs:

  (1) Actual damages

The greater of--

  **(A)** the amount of any actual damage sustained by such person as a result of such
  failure; or

  **(B)** any amount paid by the person to the credit repair organization.

  (2) Punitive damages

  (A) Individual actions

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

In the case of any action by an individual, such additional amount as the court may allow.

(B) Class actions

In the case of a class action, the sum of--

   **(i)** the aggregate of the amount which the court may allow for each named plaintiff; and

   **(ii)** the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

(3) Attorneys' fees

In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

(b) Factors to be considered in awarding punitive damages

In determining the amount of any liability of any credit repair organization under subsection (a)(2) of this section, the court shall consider, among other relevant factors--

   **(1)** the frequency and persistence of noncompliance by the credit repair organization;

   **(2)** the nature of the noncompliance;

   **(3)** the extent to which such noncompliance was intentional; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)** in the case of any class action, the number of consumers adversely affected.

CREDIT(S)

(Pub.L. 90-321, Title IV, § 409, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-459.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1968 Acts. House Report No. 1040 and Conference Report No. 1397, see 1968 U.S. Code Cong. and Adm. News, p. 1962.

Effective and Applicability Provisions

1996 Acts. Section applicable after end of 6-month period beginning on Sept. 30, 1996, except with respect to contracts entered into by credit repair organization before end of such period, see section 413 of Pub.L. 90-321, as added Pub.L. 104-208, Div. A, Title II, § 2451, Sept. 30, 1996, 110 Stat. 3009-459, set out as a note under section 1679 of this title.

LIBRARY REFERENCES

American Digest System

　　Antitrust and Trade Regulation ☞218.

　　Key Number System Topic No. 29T.

Corpus Juris Secundum

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

## <u>CERTIFICATE OF FILING AND MAILING</u>

I hereby certify that on this 23rd day of January, 2015, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies of this Reply Response Brief of Appellees via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to counsel below:

The necessary filing and mailing was performed in accordance with the instructions given me by counsel in this case.

Opposing Counsel Served:

G. Oliver Koppell
Law Offices of G. Oliver
  Koppell & Associates
99 Park Avenue, Suite 330
New York, NY 10016
okoppell@kippelllaw.com
*Counsel for Appellants*

Peter Albert Holland
HOLLAND LAW FIRM, PC
P.O. Box 6268
Annapolis, MD 21401
peter@hollandlawfirm.com

Joseph Seth Tusa
TUSA, PC
P.O. Box 566
Southold, NY 11971
joseph.tusapc@gmail.com

Gregory S. Duncan
LAW OFFICE OF GREGORY S. DUNCAN
412 East Jefferson Street
Charlottesville, VA 22902
gregdun@ntelos.net

/s/ May Serafim
Lantagne Legal Printing